## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>VICTORIA P. ROBERTS,<br><br>Debtor. | Bankruptcy Case No. 21-16000  TBM<br>Chapter 7 |
| TOGETHER REAL ESTATE<br>HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>VICTORIA P. ROBERTS,<br><br>Defendant. | Adv. Pro. No. 22-1043 TBM |

## MEMORANDUM OPINION AFTER TRIAL

## I.    Introduction.

Bankruptcy provides a temporary safe haven for "honest but unfortunate debtor[s]"[1] so that they "can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."[2]  The foundation of American insolvency law is the possibility of a discharge which provides a "fresh start" — an economic second chance which acts as a sort of safety valve in our capitalist system.  However, not all debtors are entitled to a discharge.  The Bankruptcy Code[3] "has long prohibited debtors from discharging liabilities incurred on account of their fraud . . . ."[4]

---

[1]    *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991); *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'").

[2]    *Grogan,* 498 U.S. at 286 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (internal quotation omitted)).

[3]    11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

[4]    *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998).

Those few debtors who engage in pre-bankruptcy dishonesty must continue to bear responsibility for the damages resulting from their misconduct.

This dispute requires the Court to decide:  (1) whether Defendant-Debtor, Victoria P. Roberts ("Ms. Roberts"), a debtor who filed for bankruptcy protection, owes a debt to Plaintiff-Creditor, Together Real Estate Holdings, LLC ("TRE"); and (2) if so, whether such debt is nondischargeable under Section 523(a)(2)(A) of the Bankruptcy Code because of "false pretenses, a false representation, or actual fraud."  This case is a cautionary tale about the importance of committing important agreements (especially those concerning the extension of credit) to writing in a clear and unambiguous fashion and about doing so before loaning money.

## II.    Jurisdiction and Venue.

This Court has subject matter jurisdiction to adjudicate this Adversary Proceeding pursuant to 28 U.S.C. § 1334.  This dispute is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B) ("allowance or disallowance of claims against the estate") and (b)(2)(I) ("determinations as to the dischargeability of particular debts").  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Furthermore, the parties have consented to the Court's exercise of jurisdiction and entry of final judgment on the sole remaining claim and defenses asserted in the Complaint and Answer.  They did so in their "Joint Report" submitted on June 17, 2022, as well as at the pretrial scheduling conference held June 21, 2022.  (Docket Nos. 18 and 19.)[5]

## III.    Procedural History.[6]

## A.    The Pre-Bankruptcy State Court Lawsuit.

For several years, TRE and Ms. Roberts have been embroiled in legal disputes over two loans made by TRE.  In 2020, TRE sued Ms. Roberts (and several others) in the District Court for the City and County of Denver, Colorado (the "State Court") in the lawsuit captioned:  *Together Real Estate Holdings LLC v. Artemis Realty Investments, LLC; Victoria P. Roberts; and Karen Bordner*, Case No. 2020-CV-33195 (District Court, City and County of Denver, Colorado) (the "State Court Case").  Although the State Court issued several pretrial orders, including an "Order Granting Plaintiff's Motion to Reconsider Court's Order Re Defendants' Artemis Realty Investments LLC and Victoria P. Roberts Motion for Determination of Questions of Law" dated November 8, 2021 (Ex. K, the "State Court Reconsideration Order"), none of such pretrial orders were final.

---

[5]    Unless otherwise indicated, the Court will refer to particular documents from the CM/ECF docket for this Adversary Proceeding, using the convention: "Docket No. ___."  Similarly, the Court will refer to specific documents from the CM/ECF docket for the main bankruptcy case *In re Victoria P. Roberts*, Bankruptcy Case No. 21-16000 (Bankr. D. Colo.) (the "Main Case") using the convention:  "Main Case Docket No. ___."

[6]    The Court takes judicial notice of the docket in this Adversary Proceeding as well as in the Main Case.  *See St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may *sua sponte* take judicial notice of its docket and the facts that are part of public records).

Furthermore, the State Court did not conduct a trial or enter judgment in the State Court Case.

## B.     The Main Bankruptcy Case.

Ms. Roberts filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code on December 10, 2021 (the "Petition Date").  (Main Case Docket No. 1.)  In her Statement of Financial Affairs, Ms. Roberts noted that the State Court Case was pending as of the Petition Date.  (Main Case Docket No. 1 at 10.)  Furthermore, on her Schedule E/F, Ms. Roberts identified TRE as the holder of a contingent, unliquidated, and disputed claim in the amount of $280,000 "subject to a pending lawsuit."  (Main Case Docket No. 1 at 32.)  The bankruptcy filing stayed the State Court Case as against Ms. Roberts.  11 U.S.C. § 362(a).

There has been very little activity in the Main Case.  The Chapter 7 Trustee conducted a Section 341 Meeting of Creditors.  And, the Debtor submitted some amended Schedules.  (Main Case Docket Nos. 13 and 18.)  Thereafter, the Court entered an "Order of Discharge" discharging Ms. Roberts from most of her debts.  (Main Case Docket No. 33, the "Discharge Order.")

## C.     The Adversary Proceeding.

Prior to the entry of the Discharge Order, TRE commenced this Adversary Proceeding by filing a "Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. §§ 523(a)(2)(A) and/or (a)(4)" on March 7, 2022.  (Docket No. 1, the "Complaint.")  In the Complaint, TRE alleged that it loaned Ms. Roberts $20,000 through a promissory note dated May 30, 2019, and $260,000 through a promissory note dated July 8, 2019.  As the title of the Complaint suggests, TRE asserted two discrete claims: (1) nondischargeability of debt under Section 523(a)(2)(A) based on alleged misrepresentations; and (2) nondischargeability of debt under Section 523(a)(4) based on alleged fraud or defalcation while acting in a fiduciary capacity.

Ms. Roberts filed a "Motion to Dismiss Second Claim for Relief Pursuant to Fed. R. Bankr. P. 7012(b)(6)," seeking dismissal of TRE's Section 523(a)(4) claim.  (Docket No. 7, the "Motion to Dismiss.")  Ms. Roberts argued that TRE had failed to allege any fact that, even if accepted as true, gave rise to a claim under Section 523(a)(4).  TRE filed a "Response to Motion to Dismiss Second Claim for Relief" in which TRE "concede[d] dismissal" of its Section 523(a)(4) cause of action, but stated that it would "proceed against the Debtor/Defendant on all remaining claims in its Complaint." (Docket No. 12.)  Based on the foregoing, the Court entered an "Order Granting Motion to Dismiss," whereby the Court dismissed TRE's Section 523(a)(4) cause of action. (Docket No. 13, the "Order Granting Motion to Dismiss.")  Therefore, the only claim which remained for adjudication in this Adversary Proceeding was TRE's Section 523(a)(2)(A) cause of action premised on alleged misrepresentations.  After the entry of the Order Granting Motion to Dismiss, Ms. Roberts filed her "Answer to Complaint," denying the material facts alleged in the Complaint and the existence of any debt owed

to TRE.  (Docket No. 15, the "Answer.")  Ms. Roberts also asserted that, if she were found to be liable for any debt, such debt should be dischargeable in bankruptcy.

The Court conducted a Pretrial Scheduling Conference during which the Court set various pretrial deadlines and also scheduled a two-day trial on the Complaint and Answer, commencing on January 9, 2023.  A few months before the trial, Ms. Roberts filed a "Motion for Summary Judgment" seeking entry of judgment in favor of Ms. Roberts and against TRE on TRE's remaining Section 523(a)(2)(A) claim.  (Docket No. 25, the "MSJ.")  TRE submitted its Response to the MSJ.  (Docket No. 32.)  Ultimately, the Court denied the MSJ.  (Docket No. 39.)

Thereafter, the parties filed their "Stipulated Facts and Exhibits" (Docket No. 44, the "Stipulated Facts") as well as trial briefs.  (Docket Nos. 45 and 46.)  The dispute proceeded to trial on January 9, 2023.  At trial, the Court heard opening statements followed by testimony from Ron Chappell and Ms. Roberts.  The Court also admitted into evidence Exhibits 1-4, 6-8, 12, 14-18, 21 (for a limited purpose), 22-24, 37, 44-46, and 47 (in part) as well as Exhibits I and K.  (Docket No. 49.)[7]  During the closing arguments, TRE asserted that the State Court Reconsideration Order was entitled to some form of preclusive effect under the doctrine of "collateral estoppel."  (Docket No. 52, Transcript of Trial at 257-58 [hereinafter cited as "Trans. ___.])  Accordingly, the Court ordered the parties to provide supplemental briefing on the assertion of collateral estoppel.  Subsequently, TRE filed "Plaintiff's Brief Regarding Issue Preclusion." (Docket No. 51, "TRE's Brief").  Therein, TRE discarded its assertion of "collateral estoppel" and instead characterized the topic as "issue preclusion."  Ultimately, TRE acknowledged that "the state court's ruling [State Court Reconsideration Order] does not have preclusive effect in this proceeding . . . ."  In Ms. Roberts' Response to TRE's Brief (Docket No. 54), Ms. Roberts agreed that the State Court Reconsideration Order had no preclusive effect in this Adversary Proceeding.

The Court, having considered the evidence presented at the trial (including the testimony and admitted exhibits) the Stipulated Facts, and the arguments presented by the parties at trial and in their briefs, finds that the dispute is ripe for decision.

## IV.    Findings of Fact.

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 based upon the evidence presented at the trial (including the testimony and admitted exhibits) and the Stipulated Facts.

## A.    The Relationship Between TRE and Ms. Roberts.

TRE is a California-based real estate investment company managed by Ron Chappell ("Mr. Chappell") as well as his wife and son.  For the most part, TRE invests in "fix-and-flip type" real estate.  Occasionally, TRE makes loans to other investors who

---

[7]    Exhibits 44 and 45 were not mentioned during the trial.  However, the parties stipulated to the admission into evidence of Exhibits 44 and 45 in the Stipulated Facts.

are doing "fix-and-flips."  TRE also receives passive income from some investments in shopping centers and apartment buildings.

Ms. Roberts is a real estate broker who has been licensed to practice in Colorado for about nine years.  Even though she remains licensed as a real estate broker, Ms. Roberts currently works as a brand ambassador for a vineyard.

The relationship between TRE and Ms. Roberts came about through a third-party:  Karen Bordner ("Ms. Bordner").[8]  One of TRE's managers, Mr. Chappell, met Ms. Bordner around 2016 (or possibly later)[9] through a company called "FortuneBuilders."[10]  Ms. Bordner is a real estate broker, investor, and project manager involved in "fix-and-flip" properties in Denver, Colorado.  At the time Mr. Chappell became acquainted with Ms. Bordner, Ms. Bordner worked with Ms. Roberts at the same real estate brokerage firm.

TRE hired Ms. Bordner as a real estate broker to assist TRE in finding "opportunities in the Denver area."  Working with Ms. Bordner, TRE bought an apartment building referred to as the "Corona Property" in December 2018.  TRE renovated and converted the Corona Property into condominiums.  Ms. Bordner acted as TRE's "project manager" for renovation of the Corona Property.

Sometime during Ms. Bordner's work with TRE on the Corona Property, Ms. Bordner introduced TRE to Ms. Roberts.  After completion of the Corona Property renovation, Ms. Roberts served as TRE's real estate broker for sale of four of the six converted condominium units.  Meanwhile, Ms. Bordner assisted TRE as a real estate broker for a fifth converted unit.

## B.    Artemis Realty Investments LLC.

While the Corona Property renovation was still in process (around the spring of 2019), Ms. Bordner and Ms. Roberts began to look for other possible "fix-and-flip" opportunities in the metropolitan Denver area for themselves.  Their idea was to form a limited liability company as a vehicle for their purchase and renovation of real properties.  They chose the name "Artemis Realty Investments" and began the process for formally registering as a limited liability company during approximately mid-May 2019.  According to Ms. Roberts' undisputed testimony, there was delay of several weeks as they "were waiting for the official documents so we could get an EIN [Employee Identification Number] from the government to open a bank account."

Whatever the reason for the delay, "Artemis Realty Investments, LLC" ("Artemis Realty") was not technically formed until July 2, 2019, at which time Ms. Roberts (acting

---

[8]     Ms. Bordner did not testify at the trial.  Accordingly, findings of fact about Ms. Bordner's role and conduct are based mostly on the testimony of Mr. Chappell and Ms. Roberts, along with very limited documentation admitted into evidence.

[9]     Mr. Chappell's testimony concerning the timing of the connection with Ms. Bordner was unclear.

[10]    The Court received no other information about "FortuneBuilders."

as "the person forming the limited liability company" and the "registered agent") caused "Articles of Organization" for Artemis Realty to be filed with the Colorado Secretary of State. (Ex. 7.) On the same day, July 2, 2019, Ms. Bordner and Ms. Roberts both executed an "Operating Agreement" for Artemis Realty (the "Operating Agreement"). (Ex. 11.) Ms. Bordner and Ms. Roberts are the only Members of Artemis Realty. They each own 50% of the membership interests. (*Id.*) Ms. Roberts is the sole Manager of Artemis Realty. (*Id.*).

Although Artemis Realty was not formed as a Colorado limited liability company until July 2, 2019, even before such step, Ms. Bordner and Ms. Roberts began informally using the term "Artemis Realty" as a "doing business name" or "trade name" for their work together.

## C.   <u>The Race Property</u>.

Prior to the registration of Artemis Realty, Ms. Bordner and Ms. Roberts found an apartment building located at 1453 Race Street, Denver, Colorado (the "Race Property"). Together, Ms. Bordner and Ms. Roberts decided to purchase the Race Property and then renovate and convert the Race Property into condominiums in a fashion similar to the Corona Property renovation and conversion performed by TRE.

On May 24, 2019, "Victoria P. Roberts and Karen Bordner AKA Artemis Realty Investments" made an offer to purchase of the Race Property at a price of $1,400,000 pursuant to a "Contract to Buy and Sell Real Estate (Commercial)" (the "Race Offer"). (Ex. 1.) A few days later, the sellers submitted a "Counterproposal" for a purchase price of $1,575,000. (Ex. 2.) The Counterproposal was accepted. According to the Counterproposal, the "Buyer" was "Artemis Real Estate Investments" "by Victoria Roberts" and "by Karen Bordner." The Court refers to the Race Offer and the Counteroffer together as the "Race Contract." The Race Contract required an earnest money deposit of $15,000 by May 31, 2019, and was contingent on a "New Loan."

## D.   <u>The First Loan</u>.

Sometime in May 2019, Ms. Bordner raised the topic of the Race Property with TRE. Ms. Bordner suggested that TRE participate as an investor (not as an owner). Based upon conversations with Ms. Bordner, Mr. Chappell understood that Ms. Bordner and Ms. Roberts wanted TRE to provide the earnest money deposit for purchase of the Race Property. Mr. Chappell thought that the earnest money loan would be short-term and would be paid out at the close of escrow when Ms. Bordner and Ms. Roberts purchased the Race Property. Ms. Roberts did not participate in any discussions with Mr. Chappell about the earnest money loan.

On May 30, 2019, TRE wired $20,000 (the "First Loan") to Ms. Bordner's personal bank account. (Ex. 4; Stip. Fact No. 6.) No money was ever sent to Ms. Roberts.

6

In any event, prior to the First Loan funds being wired to Ms. Bordner on May 30, 2019:

- Neither Mr. Chappell nor anyone else at TRE had communicated with Ms. Roberts about the First Loan.[11]

- TRE did not request a loan application from either Ms. Bordner or Ms. Roberts.  Neither Ms. Bordner nor Ms. Roberts submitted a loan application to TRE.

- TRE did not request any financial information from Ms. Bordner or Ms. Roberts.  Neither Ms. Bordner nor Ms. Roberts provided TRE with any financial information.

- TRE did no financial investigation or due diligence whatsoever.

- No contract, promissory note, or other documentation was executed by TRE, Ms. Bordner, or Ms. Roberts.

Based upon the uncontested evidence, the Court finds that Ms. Roberts made no representations at all, let alone misrepresentations, to TRE before TRE funded the First Loan by sending $20,000 to Ms. Bordner.  Even Mr. Chappell confirmed the point clearly when he testified:

> Q.  Prior to extending this $20,000 dollar loan, were there any representations outside of statements in the [First Note] made to you or [TRE] that you relied on in making this loan?
>
> A.  Other than the deed of trust [referenced in the First Note]?

---

[11]     Ms. Roberts testified credibly, consistently, and repeatedly that she never communicated with either Mr. Chappell or TRE about the First Loan before the First Loan.  For example, she swore:

> Q.  Prior to the funding of the first loan, what conversations had you, individually, had with [TRE] about this loan [First Loan]?
>
> A.  None whatsoever.
>
> Q.  What representations did you make about the terms of this loan [First Loan] to [TRE]?
>
> A.  None.

(Trans. 215:7-13.)  Mr. Chappell did not contest such testimony.  Instead, he appeared to concede that there were no "conversations with Ms. Roberts before extending this $20,000 dollar loan."  (Trans. 32:3-5.)  Although Mr. Chappell vaguely referenced that Ms. Roberts "was copied on the e-mails" (Trans. 32:5), the Court did not receive in evidence any e-mails sent by Mr. Chappell to Ms. Roberts or copied to Ms. Roberts.

Q.  Yes.

A.  No.

(Trans. 32:24-33:5.)  Unpacking that testimony, TRE has effectively admitted that it did not rely on any oral representations from anyone before making the First Loan.  Instead, TRE contends that it only relied on the statements in the First Note (defined below) itself.  But even that contention is demonstrably false since the First Note was not executed until weeks after TRE advanced the First Loan, and, furthermore, because TRE did not receive the signed First Note until much later still.  This example and others cause the Court to doubt Mr. Chappell's credibility as a witness.

Remarkably, as noted above, neither TRE, Ms. Bordner, nor Ms. Roberts executed a contract, promissory note, or other documentation before TRE sent $20,000 to Ms. Bordner on May 30, 2019, for the First Loan.  The haphazard extension of credit in the First Loan contrasts with TRE's standard practice.  In all other loans made by TRE prior to the First Loan, the "only way" TRE made loans "was to have that promissory note signed prior to funding a loan."  (Trans. 109:1-4.)

In any event, at some point after the First Loan already had been funded by TRE, Mr. Chappell drafted a "Promissory Note" to evidence the First Loan of $20,000 (the "First Note.")  (Ex. 3.)  Ms. Roberts first received the First Note (in blank form) on June 12, 2019.  The First Note lists the date as "May 30, 2019."  However, it was not signed on that date.  In the preface, the First Note identifies the borrowers as "Karen Bordner and Victoria Roberts with offices located at 4655 Burgundy Ln, Boulder, CO."  Ms. Bordner and Ms. Roberts both signed the First Note as individual borrowers on June 12, 2019 (about two weeks after TRE had extended the credit).  Strangely, Ms. Bordner and Ms. Roberts also both signed the First Note as "Personal Guarant[ors]" and assumed "joint and several liability for this debt."  Artemis Realty (which was not formally formed until a few weeks later) is not mentioned in the First Note.

In the First Note, Ms. Bordner and Ms. Roberts "promise[d] to pay to the order of [TRE] . . . $20,000 plus 2 POINTS origination and accrued interest with an annual interest rate of . . . 13% compounded annually . . . together with costs of collection, including a reasonable attorney's fee."  In addition, the First Note requires monthly interest payments of $217 and lists a six-month maturity.  The last sentence in the First Note states:  "This Note is secured by a mortgage deed on the property commonly known as 1453 Race Street, CO 80206."  But neither Ms. Bordner nor Ms. Roberts ever owned the Race Property.  As already noted, TRE could not have relied on the promises and statements in the First Note itself in extending the $20,000 in credit to Ms. Bordner and Ms. Roberts on May 30, 2019, since the First Note was not signed until June 12, 2019.  And, perhaps, more importantly, TRE did not even receive the executed the First Note until much later (about a year or more) in the discovery process in the State Court Case.

8

Notwithstanding, the Court finds that the obligations under the First Note are personal obligations of Ms. Roberts.  Ms. Roberts acknowledged as much in her testimony.  (Trans. 156:25-157:3.)  And, Ms. Roberts' counsel candidly admitted during closing argument that "there's the concession that she [Ms. Roberts] is obligated on the $20,000 dollar claim [First Loan Note]."  (Trans. 296:18-23.)

## E.    The Second Loan.

Meanwhile, subsequent to the Race Contract, Ms. Roberts and Ms. Bordner undertook efforts to obtain financing.  On June 29, 2019, "Artemis Realty Investments, LLC" (which was not formally formed until a few days later) borrowed $150,000 on an unsecured basis from Robert Donato pursuant to a Promissory Note (the "Donato Note").  (Ex. 6; Stip. Fact No. 7.)  After listing the borrower as "Artemis Realty Investments, LLC," Ms. Roberts signed the Donato Note as the Manager ("Mgr.") for Artemis Realty.  Ms. Bordner signed the Donato Note as a Member ("Mbr.") of Artemis Realty.

After Artemis Realty "was under contract" for the Race Property, an additional loan "in the amount of $260,000 was discussed with TRE."  (Stip. Fact No. 8.)  Then, on July 8, 2019 (after Artemis Realty was formally formed), TRE sent $260,000 to Artemis Realty's bank account (the "Second Loan").  (Ex. 14; Stip. Fact No. 9.)   Prior to the Second Loan funds being wired by TRE to Artemis Realty on July 8, 2019:

- •   TRE did not request a loan application from Artemis Realty.  Artemis Realty did not submit a loan application to TRE.

- •   TRE did not request any financial information from Artemis Realty, Ms. Bordner, or Ms. Roberts.

- •   Neither Artemis Realty, Ms. Bordner, nor Ms. Roberts provided TRE with any financial information except a spreadsheet characterized by Mr. Chappell as a "deal analyzer" containing "analytics" or a "prospectus" regarding the Race Property (the "Deal Analyzer").[12]

---

[12]    TRE did not introduce the Deal Analyzer into evidence at the trial.  However, Mr. Chappell described the Deal Analyzer this way:

> [The Deal Analyzer] says, okay, how much are you going to buy the property for, what costs are you going to incur, what holding costs are you going to have, assumptions on interest rates on different loans, and duration of time to hold the property.  And then basically it says, okay, and what's my — what they call the after-repair value. So they purchase the property, put a bunch of money into it, it's all fixed up and nice; how much is it worth now on the market?  And that's . . . basically . . . the foundation for determining if there is a profitable way forward on making certain investments.

(Trans. 139:23-140:11.)

- TRE did no financial investigation or due diligence other than considering the Deal Analyzer.

- TRE did not request, receive, or review any documents about Artemis Realty such as its Articles of Organization or Operating Agreement.

- No contract, promissory note, or other documentation was executed by TRE, Ms. Bordner, or Ms. Roberts.

Other than the wire transfer instructions (Ex. 14), the Second Loan was not documented when the $260,000 was sent to Artemis Realty.  In other words, there was no written contract, promissory note, or agreement.  However, the same day, TRE prepared and sent a draft "Promissory Note" dated July 8, 2019, for principal of $260,000 (the "Draft Note").  (Ex. 13.)  Remarkably, the Draft Note has never been signed by anyone.  (Stip. Fact No. 11.)  In sending $260,000 to Artemis Realty on June 8, 2019, with no documentation, TRE again departed from its standard operating procedure which required that promissory notes be executed prior to extending credit.

Notwithstanding that the Draft Note has never been executed, the following are the key terms.

> FOR VALUE RECEIVED, Karen Bordner and Victoria Roberts, managers of Artemis Realty Investments LLC with offices located at 8300 Fairmont Dr., LL102, Denver, Colorado, promises to pay to the order of [TRE] . . . $260,000 plus 2 POINTS origination and accrued interest with an annual interest rate of THIRTEEN PERCENT (13%) compounded annually from the day said funds are disbursed, together with costs of collection, including a reasonable attorney's fee . . . . Monthly interest payments of the sum of  . . . $2,817 are due . . . each month . . . .  All accrued interest and principal shall be due upon completion of the project securing this note or within SIX MONTHS . . . . This Note is secured by a mortgage deed on the property commonly known as 1453 Race Street, Denver, CO 80206.

(Ex. 13.)  Notably, TRE prepared the Draft Note using the address of Artemis Realty, which address is not the same address used for Ms. Bordner and Ms. Roberts personally in the First Note.  (The address for Artemis Realty in the Draft Note matches the address used for the entity listed in Artemis Realty's Operating Agreement.) Notwithstanding the identification of Artemis Realty as the borrower at the beginning of the Draft Note, the blank signature block in the Draft Note lists "Karen Bordner" and "Victoria Roberts."

After the signature blocks on the Draft Note, there is another separate instrument titled: "PERSONAL GUARANTEES" (the "Draft Guaranty") which provides:

The undersigned agree to personally assume the joint and several liability for this debt.

PERSONALLY GUARANTEED: _____
                              (Signature)
                      _____, PERSONALLY
                      Karen Bordner


                      _____
                           (Signature)
                      _____, PERSONALLY
                      Victoria Roberts

All the signature blocks are blank.  Notably, the signature blocks in the Draft Note do not use the term "PERSONALLY" which was used in the Draft Guaranty.

## F.   Termination of the Race Contract.

On July 12, 2019, Artemis Realty terminated the Race Contract for unsatisfactory conditions primarily related to the roof of the building.  (Ex. 15; Stip. Fact No. 12.)  The next day, the sellers of the Race Property released the $15,000 earnest money to Artemis Realty.  (Ex. 16.)  Neither Ms. Bordner, Ms. Roberts, nor Artemis Realty repaid TRE the First Loan with the returned earnest money from the Race Contract.  Further, Artemis Realty did not return the $260,000 Second Loan funds to TRE which had been received a few days before the termination of the Race Contract.  Instead, "TRE agreed that the same funds [proceeds of the First Loan and Second Loan] could be used for the acquisition and improvement of the [Emerson Property]"(as defined below).  (Stip. Fact No. 13.)

## G.   The Emerson Property.

A few weeks after the termination of the Race Contract, on July 26, 2019, Artemis Realty made an offer to  purchase a different property, 1101 Emerson Street, Denver, Colorado (the "Emerson Property") at a price of $1,200,000 pursuant to a "Contract to Buy and Sell Real Estate (Commercial)" (the "Emerson Offer").  (Ex. 17.)  The signature block for the Emerson Offer listed the "Buyer's Name" as "Artemis Realty Investments LLC" followed by the signatures of its two members:  Ms. Bordner and Ms. Roberts.  A few days later, the sellers submitted a "Counterproposal" for a purchase price of $1,242,500.  (Ex. 18.)  The Counterproposal was accepted.  The Court refers to the Emerson Offer and the Counteroffer together as the "Emerson Contract."  The Emerson Contract required an earnest money deposit of $15,000 by "3 Business Days from MEC" and was contingent on a "New Loan."

Shortly thereafter, on September 30, 2019, Artemis Realty secured a new loan from Triumph Capital Partners, LLC, for $1,523,670 (the "Triumph Loan").  (Ex. 22; Stip.

11

Fact No. 15.)  The Triumph Loan was designed to be a "first position" "construction loan" for the purchase and renovation of the Emerson Property.

Artemis Realty closed on the acquisition of the Emerson Property the same day: September 30, 2019.  (Ex. 23.)  As part of the acquisition, Artemis used "part of the $280,000 loaned by TRE."  (Stip. Fact No. 14.)  Also, Artemis Realty executed a "Commercial Deed of Trust, Security Agreement, Fixture Filing, and Assignment of Leases and Rents," pledging the Emerson Property as collateral to secure the repayment of the Triumph Loan.  (Ex. 24.)  Artemis Realty did not execute a deed in trust in favor of TRE pledging the Emerson Property.  (Stip. Fact No. 16.)

## H.    The Memo.

In between the termination of the Race Contract and the closing on the Emerson Property, Artemis Realty sent TRE a very unusual document dated August 8, 2019. (Ex. 21.)  The document is not titled.  So, solely as a means of reference, the Court refers to the document as the "Memo."[13]  The Memo is reproduced in its entirety below:

Artemis Realty Investments, LLC                    8/8/2019
8300 Fairmount Drive LL-102
Denver, CO 80247

Together Real Estate Holdings, LLC
6161 Palisade Drive
Huntington Beach, CA 92647

Promissory Note Dated 7/8/2019 (Changes)
$260,000 at 13% Interest for 12 months = $33,800.00
Monthly payment $2816.67

For: 1101 Emerson Street (Real Estate Property)
Denver, CO 80218
All Other Terms Remain Unchanged

First Payment Included with this Letter

Best Regards,
Victoria P Roberts   _JPRoberts 8/8/19_
Managing Member

---

[13]     TRE has referred to the document as the "signed writing."  During cross-examination, counsel for Ms. Roberts alluded to the document as a "letter."  Neither characterization seems particularly apropos. Most letters contain sentences.  This document does not.  And, while the document is indeed in writing and signed, that adds little.  The Court uses the term "Memo" because it seems the best short-hand description for the document.

The start of the Memo lists two entities:  Artemis Realty and TRE.  Similar to the format of a letter, the Court concludes that the initial block of text identifies the sender of the Memo (like letterhead or a heading) as Artemis Realty:

Artemis Realty Investments, LLC
8300 Fairmount Drive LL-102
Denver, CO 80247

Then, the following block identifies the recipient or addressee of the Memo:

Together Real Estate Holdings, LLC
6161 Palisade Drive
Huntington Beach, CA 92647

The next part of the Memo references the Draft Note: "Promissory Note Dated 7/8/2019 (Changes)."  The Memo includes an identification of principal and interest plus a monthly payment ($2,816.67), which is similar to the Draft Note.  The "12 months" stated in the Memo is double the "Six (6) Months" contained in the Draft Note.  Then, the Memo lists a different parcel of real estate (Emerson Property) than identified in the Draft Note.  The remaining text states:  "All Other Terms Remain Unchanged . . . First Payment Included with this Letter."  The "payment included with this letter" refers to a check from Artemis Realty, dated August 8, 2019, to TRE in the amount of $3,033.34 which includes the notation: "260K + 20K Loan Interest."  (Ex. I.)

Importantly, the Memo was signed by "Victoria Roberts" as "Managing Member" of Artemis Realty.  It was not signed by her in her personal or individual capacity.  For example, the signature block does not use the term "Personally" which was used in the First Note and the Draft Guaranty.  The Memo does not mention the Draft Guaranty (which followed the Draft Note).  In the Memo, Ms. Roberts did not commit to personally guarantee anything.  Furthermore, the lack of a signature from Ms. Bordner (the other proposed guarantor in the Draft Guaranty) further suggests the lack of a personal guaranty.

The Court finds that the Memo was prepared by, signed by, and sent by a corporate entity (Artemis Realty) to another corporate entity (TRE).  Ms. Roberts testified that she did not intend that the Memo act as some sort of personal guaranty of the Second Loan to Artemis and only sent it in her capacity as the Manager of Artemis Realty.  (*See* Trans. 220:1-14.)  Even Mr. Chappell had the same understanding.  Notably, Mr. Chappell testified as follows:

> Q.  Now, I want to turn to the letter that's been admitted as Exhibit 21 [the Memo] . . . .  Now with respect to this letter, at the bottom it states . . . 'Victoria P. Roberts, Managing Member', correct?
>
> A.  Yes.

Q.  And you, yourself are a managing member of a company, right?

A.  Yes.

Q.  So you are aware that is a different capacity than somebody acting individually, right?

A.  Yes.

(Trans. 120:24-121:10.)  On its face and also based upon the testimony, the Court finds that the Memo does not purport to bind Ms. Roberts personally to do anything.[14]

I.    **Payments from Artemis to TRE and Remaining Debt**.

Notwithstanding that the Draft Note was never signed, Artemis made some payments to TRE on the First Loan and Second Loan.  Although neither party submitted evidence of all the payments, Artemis Realty paid TRE at least the following:

| Date | Amount |
| --- | --- |
| August 8, 2019 | $  3,033.34 |
| September 9, 2019 | $  3,033.34 |
| October 8, 2019 | $  3,033.34 |
| November 5, 2019 | $  3,033.34 |
| November 5, 2019 | $  5,200.00 |
| December 12, 2019 | $     200.00 |
| January 7, 2020 | $  3,233.34 |
| Total: | $20,766.70 |

(Ex. I.)  All the foregoing payments were made on a combined basis toward both the First Loan and the Second Loan.

In addition to the foregoing payments, Mr. Chappell acknowledged that Ms. Bordner made additional payments on the First Note from her own personal bank account.  (Trans. 125:23-126:6.)  However, the Court received no evidence about the amount of such additional payments.  Similarly, Mr. Chappell acknowledged that there were additional payments from Artemis Realty (beyond those listed above) and that the "last payment" from Artemis Realty was made in June 2020.  (Trans. 126:9-15.)  In the Complaint, TRE also alleged that Ms. Roberts "made monthly interest payments on both loans [First Loan and Second Loan] from July 2019 through June 2020 . . . ." and she

---

[14]    The Court believes that the foregoing is a factual finding based on the evidence.  However, to the extent that the foregoing is not a factual finding, the Court reaches the same result as a legal conclusion.

14

"stopped paying the monthly interest payments after June 2020 . . . ."  (Compl. ¶ 16-17.)  However, the Court did not receive any evidence of the dates and amounts of the additional payments between January and June 2020.  So, the Court has no way of knowing the full amount of payments actually made on the First Loan and the Second Loan nor the actual balance due.

In any event, Ms. Roberts testified that Artemis Realty intended to repay the First Loan and the Second Loan but could not because of difficulties in the renovation of the Emerson Property which caused Artemis Realty to "r[u]n out of money."  (Trans. 225:15-16.)  Artemis Realty also defaulted on the Triumph Loan.  The testimony was unrebutted and the Court accepts it.

Neither TRE nor Ms. Roberts has produced a ledger or other evidence showing the application of payments on the First Loan and the Second Loan or the accrual of interest.  However, Mr. Chappell testified that the aggregate amount due to TRE on the First Loan and the Second Loan is $451,687.03.  (Trans. 102:24-104:23.)  TRE failed to split out the amount due under First Loan and the Second Loan separately.  But the testimony tended to indicate that the full principal on the First Loan ($20,000) remains due, along with interest accruing after June 2020.  The Court supposes that the rest of the claim may be ascribed to the Second Loan.  Ms. Roberts did not dispute the calculation of the aggregate amount unpaid.

## J.   <u>Subsequent Loans from Small Business Administration and Ms. Roberts</u>.

On July 29, 2020, Artemis Realty secured a loan from the U.S. Small Business Administration (the "SBA Loan").  (Ex. 37; Stip. Fact No. 18.)  Both Ms. Bordner and Ms. Roberts guaranteed repayment of the SBA Loan.  Neither Artemis Realty, Ms. Bordner, nor Ms. Roberts informed TRE when Artemis Realty obtained the SBA Loan.  "On July 31, 2020, Ms. Roberts made a $50,200 loan to Artemis to provide additional funds for the [Emerson Property] project."  (Stip. Fact No. 19.)[15]

---

[15]     The Court includes this fact in its findings because the parties stipulated to it; however, it does not seem to be supported by the testimony and documentary evidence presented at trial.  Instead, the evidence shows that Artemis Realty borrowed $50,300.00 from the SBA on June 29, 2020.  (Ex. 47 at 22-23).  The evidence also shows that Ms. Roberts and Ms. Bordner signed a document entitled "Promissory Note" on July 31, 2020, which states:

> A LOAN IN THE AMOUNT OF $50,200.00 HAS BEEN EXTENDED TO ARTEMIS REALTY INVESTMENTS FOR THE PURPOSE OF FUNDING 1101 EMERSON STREET DENVER CO 80218 CONTRSUCTION DATED JULY 31, 2020.

> THIS NOTE IS COLLAERALIZE BY THE ABOVE PROPERTY AND REPAYMENT IS DUE UPON THE SALE OF 1101 EMERSON STREET DENVER, CO 80218.  BOTH MEMBERS OF ARTEMIS REALTY INVESTMENT LLC[] ARE RESPONSIBLE FOR THE REPAYMENT EQUALLY BEFORE ANY PROFITS ARE DISPURSED [sic].  In the event there are no profits, this Note is the responsibility of Artemis Realty Investments LLC Members to repay this Note in equal shares.

**K.**    **Payments from Artemis Realty to Cash**.

From February 10, 2020 to September 1, 2020, Artemis Realty wrote the following checks to "CASH":

| Date | Amount |
|------|--------|
| February 10, 2020 | $ 2,500.00 |
| March 3, 2020 | $ 2,500.00 |
| March 24, 2020 | $ 2,500.00 |
| May 2, 2020 | $ 2,500.00 |
| May 7, 2020 | $ 3,400.00 |
| May 8, 2020 | $ 3,000.00 |
| June 1, 2020 | $ 2,500.00 |
| June 20, 2020 | $ 2,000.00 |
| July 2, 2020 | $ 2,500.00 |
| July 26, 2020 | $ 3,500.00 |
| August 23, 2020 | $ 2,000.00 |
| August 31, 2020 | $39,284.31[16] |
| September 1, 2020 | $    215.00 |
| Total: | $68,399.31 |

(Ex. 46.)  TRE repeatedly argued that the foregoing were proceeds of the First Loan or Second Loan which were taken by Ms. Roberts for her personal use.  However, the Court received no evidence to prove TRE's surmise.  There is no evidence that the amounts in Artemis Realty's financial account originated from TRE.  Such amounts may have come from other loans obtained by Artemis such as the Donato Note, the Triumph Loan, the SBA Loan, or from other sources.  Furthermore, the Court accepts Ms. Robert's unrebutted testimony that she did not use any of the foregoing funds for personal uses.  Instead, all such funds were used by Artemis Realty to pay suppliers and contractors in an attempt to complete renovation of the Emerson Property.  Indeed, the entirety of the First Loan and the Second Loan were put "[i]n the building [Emerson Property]."  (Trans. 182:10-12.)  Thus, the Court finds that Ms. Roberts did not use any proceeds from the First Loan or the Second Loan personally.

---

While TRE argued that this document was evidence that Artemis Realty had borrowed additional funds without telling TRE, Ms. Roberts explained that this document should have been titled "minutes of proceeding" rather than "PROMISSORY NOTE" and that the document was intended merely to reflect that Artemis Realty had taken out a loan from the SBA – not as evidence of a loan from her to Artemis Realty.  Ms. Roberts also explained that "$50,200.00" was a typographical error, as the amount of the SBA loan was $50,300.00.  This all seems plausible to the Court, particularly since there was no evidence showing a deposit of funds from her account to Artemis Realty's account, nor a debit in that amount from one of her accounts.  Nevertheless, the Court accepts the fact as stipulated.

[16]      This transaction was not by check but instead an account withdrawal.

L.      **The Order Granting Reconsideration.**

On November 8, 2021, the State Court entered the Order Granting Reconsideration.  (Ex. K.)  Having reviewed the Order Granting Reconsideration, it is apparent that the State Court received different evidence than provided in this Adversary Proceeding at the trial.  In any event, in the Order Granting Reconsideration, the State Court found, among other things:

> 1.      Plaintiff's [TRE's] claims related to the $260,000 loan against Defendants Artemis [Realty] and Ms. Roberts are enforceable under C.R.S. § 38-10-124;
>
> 2.      Whether Ms. Robert's signature on the Signed Writing [Memo] constitutes a personal guarantee under C.R.S. § 38-10-112 for the $260,000 is a question of fact to be submitted to the jury.

(Ex. K.)  The Court confesses that it does not understand the Order Granting Reconsideration.   On the one hand, the Order Granting Reconsideration suggests that TRE's "claims related to the $260,000 loan" are "enforceable" against Ms. Roberts.  On the other hand, in the very next sentence, the Order Granting Reconsideration seems to suggest the opposite: whether Ms. Roberts is personally liable as a guarantor of the Draft Note "for the $260,000" "is a question of fact to be submitted to the jury."  The Court observes that the Order Granting Reconsideration does not reference any controlling case law and contains very little legal analysis.  Furthermore, the Order Granting Reconsideration is not final.

In any event, during closing argument, counsel for TRE insisted repeatedly that the Court should apply the doctrine of collateral estoppel and find that TRE's "claims related to the $260,000 loan" are "enforceable" against Ms. Roberts because of the Order Granting Reconsideration.  (Trans. 254-258.)  During the closing argument, counsel for TRE was unable to cite any case law supporting the application of collateral estoppel in such circumstances.  Accordingly, the Court ordered TRE and Ms. Roberts to provide supplemental briefs on the collateral estoppel issue.

Thereafter, counsel for TRE submitted "Plaintiff's Brief Regarding Issue Preclusion" (Docket No. 51), wherein TRE characterized the issue as one of "issue preclusion" rather than "collateral estoppel."  In any event, and contrary to its closing argument, TRE acknowledged that the Order Granting Reconsideration "is not a 'final judgment'" and further conceded that "the State Court's ruling [Order Granting Reconsideration] does not have preclusive effect in this proceeding . . . ."  Nevertheless, TRE invited the Court to "review the ruling [Order Granting Reconsideration] and apply it because it is both logical and persuasive."  (Docket No. 51.)

Given TRE's concession that the Order Granting Reconsideration is not final and does not have any preclusive effect, there is no legal basis for the Court to "apply" the

17

Order Granting Reconsideration. *See Sunny Acres Villa*, 25 P.3d 44, 47 (Colo. 2001) (stating requirements to establish issue preclusion); *Bebo Const. Co. v. Matox & O'Brien, P.C.* 990 P.2d 78, 84 (Colo. 1999) (same). Further, the Court observes from review of the Order Granting Reconsideration that the State Court received different evidence (some e-mails) than presented at the trial in this Adversary Proceeding. Since the State Court Case did not proceed to trial, the Court also supposes that the State Court did not have the benefit of any testimony. In any event, the Court does not find the Order Granting Reconsideration particularly "logical and persuasive." In fact, the State Court provided very little legal reasoning and the Court does not understand the basis of the State Court's determinations. So, the Court discards the Order Granting Reconsideration on both a factual and legal basis.

## M.   Alleged Misrepresentations.

In the Complaint, TRE asserted only the following as an alleged misrepresentation:

> Debtor represented that she would fulfill the terms of the $20,000 Note and $260,000 Note, particularly with respect to the repayment terms of those notes and that they be secured by the Property.

(Compl. ¶ 21.)

However, in closing argument, the allegations multiplied. Now, TRE apparently contends that Ms. Roberts made the following alleged misrepresentations to TRE with respect to both the First Loan and the Second Loan: (1) Ms. Roberts represented in the First Note that she would repay $20,000, but she did not; (2) Ms. Roberts represented in the First Note that she would execute a deed of trust, but she did not; (3) Ms. Roberts represented in the Draft Note that she would repay $260,000, but she did not; (4) Ms. Roberts represented in the Draft Note that she would execute a deed of trust, but she did not; (5) Ms. Roberts represented that she would contribute $25,000 to "this project," but she did not; (6) Ms. Roberts represented that she would not take out "additional loans to fund the projects," but she did; and (7) Ms. Roberts represented that the First Loan and the Second Loan proceeds would be used solely "for projects," but they were used for personal expenses. (Trans. 265-283.)

The Court refers to the foregoing as "Alleged Misrepresentation Nos. 1-7" and makes findings of fact regarding Alleged Misrepresentation Nos. 1-7 as follows:

### 1.   Alleged Misrepresentation No. 1 (Ms. Roberts represented in the First Note that she would repay $20,000 but she did not).

Ms. Roberts executed the First Note individually as a co-maker (along with Ms. Bordner) and also as a guarantor. Ms. Roberts did promise to pay TRE $20,000 plus

interest, fees, and points.  Although Ms. Bordner and Artemis Realty did make some payments on the First Note, it is in default and has not been fully repaid.

    **2.**    **Alleged Misrepresentation No. 2 (Ms. Roberts represented in the <u>First Note</u> that she would execute a deed of trust but she did not).**

The First Note does not state that Ms. Roberts will execute a deed of trust in favor of TRE.  Rather, it states only the following in the present tense:  "This Note is secured by a mortgage deed on the property commonly known as 1453 Race Street, Denver CO 80206."  TRE, not Ms. Roberts, prepared the First Note.  And, the text was obviously wrong.  The First Note could not be secured by the Race Property because neither Ms. Bordner nor Ms. Roberts ever owned the Race Property.  So, they could not pledge something they did not own.

    **3.**    **Alleged Misrepresentation No. 3 (Ms. Roberts represented in the <u>Draft Note</u> that she would repay $260,000 but she did not).**

The Court admitted the Draft Note into evidence.  However, the Draft Note was never executed.  And, the Draft Guaranty also was not executed.  Furthermore, the borrower under the Draft Note was Artemis Realty — not Ms. Roberts.  The Memo does not state that Ms. Roberts would be personally responsible for the Second Loan.  In any event, Artemis Realty did make more than seven payments on the Second Loan before it was no longer able to make more payments.  (Ex. I.)

    **4.**    **Alleged Misrepresentation No. 4 (Ms. Roberts represented in the <u>Draft Note</u> that she would execute a deed of trust but she did not).**

The Draft Note does not state that Ms. Roberts will execute a deed of trust in favor of TRE.  Rather, it stated only the following the present tense:  "This Note is secured by a mortgage deed on the property commonly known as 1453 Race Street, Denver CO 80206."  TRE – not Ms. Roberts – prepared the Draft Note.  And, the text was obviously wrong.  The Draft Note could not be secured by the Race Property because neither Artemis Realty, Ms. Bordner, nor Ms. Roberts ever owned the Race Property.  So, they could not pledge something they did not own.  And, TRE knew it.[17] In any event, the Draft Note (containing the language about the "mortgage deed") was never executed.

In his testimony, Mr. Chappell offered contradictory evidence about whether Ms. Roberts represented that she would execute a deed of trust.  First, Mr. Chappell swore:

> Ms. Roberts and Ms. Bordner also said that they would be signing the [Draft Note] and recording a deed of trust.

---

[17]    Mr. Chappell agreed in his testimony that "you're aware that any sort of mortgage or deed of trust could not be recorded against a property that wasn't owned at the time that this loan [Second Loan] was funded."  (Trans. 116:6-9.)

(Trans. 60:2-4 and 79:18-23.)  Notably, Mr. Chappell did not testify when such statement allegedly was made (*i.e.*, before or after the advance of the Second Loan). And, he did not testify how such statement was made (*i.e.,* orally or in writing) or the mechanism for transmission (*i.e.*, in person, by telephone, by Zoom, or by e-mail).  But later in his testimony, Mr. Chappell testified quite differently:

> Q.  Mr. Chappell, did Ms. Roberts make a representation prior to you extending the $260,000 loan that she would sign a deed of trust for the property being purchased with that money?
>
> > A.  I don't know if she was actually involved that much . . . it was more of interface with Ms. Bordner.  But after . . . we constantly asked about it."

(Trans. 80:11-14.)  The quite different (really contradictory) stories presented by Mr. Chappell cause the Court to assign low credibility to his testimony.  Instead, the Court accepts Ms. Robert's more consistent and credible testimony that she "never had that conversation" [about executing a deed of trust] before the Second Loan.  (Trans. 191:13-18.)

**5.**    **Alleged Misrepresentation No. 5 (Ms. Roberts represented that she would contribute $25,000 to "this project" but she did not).**

Mr. Chappell testified that "Ms. Roberts and Ms. Bordner both said that they were going to put in $50,000 dollars on the payment, the down payment."  (Trans. 48:23-25.) Such testimony is uncorroborated.  Notably, again, Mr. Chappell did not testify when such statement allegedly was made (*i.e.*, before or after the advance of the Second Loan).  And, he did not testify how such statement was made (*i.e.,* orally or in writing) or the mechanism for transmission (*i.e.*, in person, by telephone, by Zoom, or by e-mail). Ms. Roberts testified to the opposite:  she never told Mr. Chappell that she and Ms. Bordner "would put in $50,000 dollars of your own money into this project."  (Trans. 200:16-19.)  The Court assesses Ms. Robert's testimony as more credible and accepts it.

**6.**    **Alleged Misrepresentation No. 6 (Ms. Roberts represented that she would not take out "additional loans to fund the projects" but she did).**

Mr. Chappell affirmed that "there were representations made [to Mr. Chappell] [by an unidentified person] that no other loans would be taken on the property."  (Trans. 82:2.)  Mr. Chappell further testified that he had not known about the Donato Loan when TRE funded the Second Loan and that this omission was important because it affected "the equity in the property."  (Trans. 87:6-24.)  Notably, such testimony is not corroborated.  Again, Mr. Chappell did not testify when such statement allegedly was made (*i.e.*, before or after the advance of the Second Loan).  And, he did not testify how

such statement was made (*i.e.,* orally or in writing) or the mechanism for transmission (*i.e.*, in person, by telephone, by Zoom, or by e-mail).

Regardless, that testimony is highly suspect, even misleading, because the Donato Loan was unsecured.  So, it had no impact on equity in the Emerson Property eventually purchased by Artemis Realty.  And, even though Mr. Chappell stated that he had been promised "no other loans would be taken on the property," that testimony was wrong.  Mr. Chappell later acknowledged that he knew all along that Artemis Realty would be obtaining a "first [mortgage deed] with a construction loan."  (Trans. 119:4-7.)

**7.      Alleged Misrepresentation No. 7 (Ms. Roberts represented that the First Loan and Second Loan proceeds would be used solely "for projects" and not for personal expenses).**

Again, the Court received inconsistent testimony from Mr. Chappell.  First, he testified:

> Q.  At the time you provided the $260,000 dollar loan, were there any representations made to you by Ms. Roberts regarding whether her or Ms. Bordner could pay themselves out of the project funds.
>
> A.  Definitely not.

(Trans. 49:12-16.)  Such testimony is not corroborated.  But Mr. Chappell's main point was that Ms. Roberts omitted discussions of about the possible use of the Second Loan to pay herself, thereby misleading him, because he later found out that she used the Second Loan to pay herself.  But then he said the opposite:

> Q.  . . . another representation that you had mentioned before was that Ms. Roberts had represented that she would not pay herself out of the project fees.  Do you recall giving that testimony.
>
> A.  Yes.

(Trans. 94:19-23.)  Now, instead of omitting discussions about the topic, Ms. Roberts is accused of affirmatively declaring that she would not pay herself out of the project funds.  Given the contradictions, the Court does not accept Mr. Chappell's testimony.

And, there is another problem still.  Mr. Chappell testified that Ms. Roberts "had, in fact, paid herself out of the project funds."  (Trans. 94:24-102:19.)  This time he offered supposed corroboration:  a series of checks that Artemis Realty wrote on its own bank account to "CASH" and a withdrawal slip from Artemis Realty.  (Ex. 46; Trans. 95:4-102:19.)  But the checks and withdrawal slips do not prove that Ms. Roberts ever used "project funds" or the proceeds of the Second Loan.  TRE never established the

source of the funds in Artemis Realty's bank account.  There was no tracing.  And, the documents in no way established that Ms. Roberts used the funds for herself.  Ms. Roberts testified quite clearly and credibly that she did not personally take any of the funds in the Artemis Bank account for herself — not even "a penny of it."  (Trans. 209:6-13.)  Instead, all funds (including the checks and withdrawal slip) were used to pay suppliers to try to complete the Emerson Property renovation.  Because of the inconsistencies, the Court rejects Mr. Chappell's testimony and finds that Ms. Roberts' did not make such alleged misrepresentation and did not use the proceeds of the Second Loan for herself.

### 8.   General Findings About Alleged Misrepresentations.

In addition to the foregoing, the Court highlights again that Ms. Roberts made no representations at all to TRE before TRE advanced $20,000 under the First Loan to Ms. Bordner.  The Court also determines that, in general, the evidence proffered by TRE through Mr. Chappell about alleged misrepresentation by Ms. Roberts was vague, confusing, and contradictory.  Initially, Mr. Chappell did not seem to be able to identify (by date, time, location, or method) any specific communications or conversations with Ms. Roberts where alleged misrepresentations were made.  Upon further examination, as set forth above, Mr. Chappell's testimony often changed or evolved.  And, frequently, he seemed to treat statements made by Ms. Bordner as though they were made by Ms. Roberts, rather than focusing on what Ms. Roberts actually said.

On the other hand, Ms. Roberts was more clear, precise, and consistent.  Ms. Roberts asserted repeatedly that she had only one call with Mr. Chappell about Artemis Realty borrowing money.  According to Ms. Roberts, "that call was about him [TRE] not being a partner in . . . this particular development project."  (Trans. 217:7-12.)  During the single call, Ms. Roberts referenced the First Note and told him that the terms were "unacceptable" for any further lending.  More specifically, Ms. Roberts testified that she would not provide a "personal guarantee."  (Trans. 216:24-217:24.)  And that was it.  Ms. Roberts denied all the alleged misrepresentations.  (Trans. 217:22-219:9 and 226:17-227:5.)  The Court accepts Ms. Roberts' testimony as more accurate than Mr. Chappell's on such matters.

## V.   Legal Analysis and Conclusions.

### A.   TRE's Claim.

TRE's only remaining cause of action in this Adversary Proceeding is based on Section 523(a)(2)(A).  As the general factual predicate for such remaining claim, TRE alleged:

• TRE "agreed to make two loans to [Ms. Roberts" in the amounts of $20,000 and $260,000 . . . ."  (Compl. ¶ 6.)

• "The $20,000 loan was memorialized in a promissory note dated May 20, 2019 [First Note]" . . . . [and Ms. Roberts] "expressly agreed to the terms and conditions of the $20,000 [First Note]" . . . .  TRE "wired $20,000 as instructed by [Ms. Roberts] in reliance on Debtor's agreement to the terms and conditions of the [First Note]." (Compl. ¶¶ 7-9.)

• "The $260,000 loan was memorialized in a promissory note dated July 8, 2019 [Draft Note]" . . . . [and Ms. Roberts] "expressly agreed to the terms and conditions of the [Draft Note]" . . . .  TRE "wired $260,000 as instructed by [Ms. Roberts] in reliance on Debtor's agreement to the terms and conditions of the [Draft Note]." (Compl. ¶¶ 10-12.)  "Additionally, Debtor signed a document indicating her consent to all material terms of the [Draft Note] . . . .  (Compl. ¶ 13.)

Then, in terms of the specific Section 523(a)(2)(A) claim, TRE pled only:

• [Ms. Roberts] "*represented* that she would fulfill the terms of the [First Note] and [Draft Note], particularly with respect to the repayment terms of those notes and the requirement that they be secured by [the Emerson Property]."  (Compl. ¶ 21.) (Emphasis added.)

• [Ms. Roberts] "knew at the time she made the above *representations* that the *representations* were false especially because [she] knew that her primary lender would not allow for other mortgage liens on the Property."  (Compl. ¶ 22.) (Emphasis added.)

• [Ms. Roberts" made the *representations* with the intention and purpose of deceiving [TRE] to obtain the loan without fulfilling her promises."  (Compl. ¶ 23.) (Emphasis added.)

• TRE "relied on Debtor's *representation[s]* and did so justifiably."  (Compl. ¶ 24.) (Emphasis added.)

• TRE "sustained damages in the principal amount of $280,000, plus late fees, plus interest, plus attorney fees and costs, as proximate result of the *representations*." (Compl. ¶ 25.) (Emphasis added.)

To restate, with respect to the existence of a debt, TRE asserted that Ms. Roberts agreed to the terms of the First Note and the Draft Note and so is liable to TRE for a default in payment under the First Note and Draft Note.  Then, regarding nondischargeability, TRE's entire cause of action is premised on only one allegedly false representation: that Ms. Roberts falsely represented that she "would fulfill the terms of [First Note and Draft Note]" by repaying the obligations and ensuring that the obligations were "secured by [Emerson Property]."  In the substantive text of the Complaint, TRE never mentioned any other supposed misrepresentations.  And, in the Complaint, TRE did not specifically plead "false pretenses" or "actual fraud" as grounds

23

for the Section 523(a)(2)(A) claim.[18]  However, in closing arguments at trial, TRE asserted a kitchen-sink of supposed additional misrepresentations not identified in the Complaint, while half-heartedly also arguing that the debt should be excepted from discharge as a debt obtained by "false pretenses" and "actual fraud."

## B.   Legal Framework.

### 1.   Statutory Text.

In Section 523(a)(2)(A), Congress provided as follows:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt — . . .
>
> (2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
>
>> (A)  false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

11 U.S.C. § 523(a)(2)(A).

### 2.   Burden of Proof.

TRE bears the burden of establishing nondischargeability of a particular debt under Section 523(a) by a preponderance of the evidence.  *Grogan*, 498 U.S. at 286-87 ("Requiring the creditor to establish by a preponderance of the evidence that his claim is not dischargeable reflects a fair balance between these conflicting interests."); *Houston v. Munoz (In re Munoz)*, 536 B.R. 879, 884 (Bankr. D. Colo. 2015) (requiring creditor to prove Section 523(a) claims by a preponderance of the evidence).  Additionally, exceptions to discharge under Section 523(a) "are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."  *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).  *See also Sawaged v. Sawaged (In re Sawaged)*, 2011 WL 880464, at *3 (Bankr. D. Colo., Mar. 15, 2011) (same).

---

[18]      The heading to "Count I" in the Complaint states:  "Nondischargeable Debt for False Pretenses, False Representation, or Actual Fraud."  And, in Paragraph 20 of the Complaint, TRE characterizes Section 523(a)(2)(A) as involving "any debt for money to the extent obtained by false pretenses, a false representation, or actual fraud."  However, in the substantive allegations of "Count I," TRE did not plead the elements of "false pretenses" or "actual fraud" or even make reference to those types of Section 523(a)(A)(2) claims.  Instead, the entire import of the Complaint is limited to only a single alleged misrepresentation.  (Compl. ¶  21.)

### 3.    Nondischargeability Standard.

Section 523(a) nondischargeability claims all require a two-part analysis.  First, "the bankruptcy court must determine the validity of the debt under applicable law." *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2016); *see also Lang v. Lang (In re Lang)*, 293 B.R. 501, 513 (10th Cir. BAP 2003) (if the alleged debt is for fraud, "state law of fraud controls with respect to whether fraud has occurred").  This is referred to as the "claim on the debt" component.  *Thompson*, 555 B.R. at 8.  Second, if there is a valid debt, "the bankruptcy court must determine the dischargeability of that debt under Section 523."  *Id.*; *see also Lang*, 293 B.R. at 513 ("bankruptcy law controls with respect to the determination of nondischargeability").  This is referred to as the "dischargeability" component.  *Thompson*, 555 B.R. at 8.  In the context of claims based upon fraud and fraudulent concealment, there may be substantial overlap between the "claim on the debt" and the "dischargeability" components.

The Court applies the foregoing nondischargeability analysis separately for the two alleged debts: (1) the First Loan; and (2) the Second Loan.

## C.    The First Loan.

### 1.    TRE Established Ms. Roberts' Debt for the First Note.

In the Complaint and during closing argument, TRE made clear that Ms. Roberts' alleged debt for the First Loan is based on her agreeing to the First Note.  The uncontested evidence before the Court is that Ms. Roberts signed a writing, the First Note, in which she "promise[d] to pay" TRE $20,000 and she also "personally assumed joint and several liability for the debt" for the First Loan.  (Ex. 3.)  Ms. Roberts has acknowledged (in her testimony and through counsel) that she is obligated directly and personally on the debt arising from the First Note as a co-maker of the First Note.  Thus, the Court finds that Ms. Roberts owes TRE a debt for the First Loan.  Unfortunately, TRE did not provide evidence showing the exact amount owed on the First Note.  Nevertheless, the evidence established that the remaining principal is $20,000.  The First Note also contains additional terms for interest, points, and fees.

Accordingly, the Court finds that Ms. Roberts is indebted to TRE in the amount of $20,000 plus interest at the annual interest rate of 13% compounded annually (beginning on July 1, 2020, since the "last payment" was in June 2020), plus points and a late penalty as provided in the First Note, all on an unsecured basis.

2.     **TRE Failed to Establish that the Debt for the First Note is Nondischargeable under Section 523(a)(2)(A).**

a.     **TRE Failed to Establish Nondischargeability of the First Note Debt by Virtue of Misrepresentations.**

In order to establish nondischargeability on grounds of misrepresentation pursuant to Section 523(a)(2)(A), TRE must prove the following elements by a preponderance of the evidence:

> (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was [justifiable][19]; and (5) the false representation resulted in damages to the creditor.

*Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *see also Field v. Mans*, 516 U.S. 59, 74-75 (1995); *Riebesell v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009).  Further, the false representation must be "other than a statement respecting the debtor's or an insider's financial condition."

Importantly, Section 523(a)(2)(A) requires that a plaintiff show evidence of a debt for money, property, services or credit that was "*obtained by* . . . false pretenses, a false representation, or actual fraud."  11 U.S.C. § 523(a)(2)(A) (emphasis added).  As one court explained:

> The language "obtained by" clearly indicates that the fraudulent conduct occurred at the inception of the debt, *i.e.*, the debtor committed a fraudulent act to induce the creditor to part with its money, property or services . . . .
>
> To sustain a claim of nondischargeability under section 523(a)(2)(A), [a plaintiff] therefore must make a threshold showing that the alleged fraud existed at the time of, and has been the methodology by which, the money, property or services were obtained . . . .  Misrepresentations made subsequent to the creation of the debt "have no effect upon the dischargeability of a debt, since the false representation could not have been the creditor's reason for the extension of credit."

---

[19]     In *Fowler Brothers*, 91 F.3d at 1373, the Tenth Circuit states that the reliance must be "reasonable."  However, that does not mean "'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's representation."  *Riebesell*, 586 F.3d at 791.  Instead, under *Field v. Mans*, 516 U.S. 59, 74-75 (1995), the reliance must be "justifiable."

*Valley Memorial Homes v. Hrabik (In re Hrabik)*, 330 B.R. 765, 772–73 (Bankr. D.N.D. 2005) (citations and internal quotation omitted).  *See also Knopp v. Ledesma (In re Ledesma)*, 2015 WL 750548, at *4 (Bankr. D. Colo. Feb. 19, 2015) (refusing to consider representations made after debt was obtained under Section 523(a)(2)(A)); *Altercare of Navarre Center for Rehabilitation & Nursing Care, Inc. v. Donley (In re Donley)*, 2014 WL 1577236, at *5 (Bankr. N.D. Ohio Apr. 17, 2014) ("The 'obtained by' language in § 523(a)(2)(A) requires that the fraudulent conduct occurred at the origination of the debt  . . . .  A false representation made after the money, property or services were obtained is irrelevant, because such a false representation could not have been the reason credit was extended."); *Silver Care Center v. Parks (In re Parks)*, 2007 WL 2033380, at *10-12 (Bankr. D.N.J. Jul. 10, 2007) (same); 4 Collier on Bankruptcy, ¶ 523.08[1][d], 523-44 (16th ed. 2022) ("If the property or services were obtained before the making of any false representation, subsequent misrepresentations will have no effect on dischargeability.").  "In essence, for a court to make a determination of nondischargeability under section 523(a)(2)(A), a creditor must prove fraud in the inducement . . . ."  *Mission Compound LLC et al. v. Keisler (In re Keisler and Dickens)*, 2015 WL 1775155, at *7 (Bankr. E.D. Tenn. Apr. 15, 2015).  *See also Daily v. Garrett (In re Garrett)*, 2018 WL 4057228, at *4 (9th Cir. BAP Aug. 24, 2018) (same); *Ghadimi v. Ashai (In re Ashai)*, 211 F. Supp. 3d 1215, 1235-38 (C.D. Cal. 2016) (same); *Gross v. Osborne (In re Osborne)*, 520 B.R. 861, 870 (Bankr. D.N.M. 2014) (determining that there could be no reliance on defendant's communications made after loans had been fully advanced).

With respect to the First Loan, in the Complaint TRE asserted only that Ms. Roberts falsely represented that she "would fulfill the terms of [First Note]" by repaying the obligations and ensuring that the obligations were "secured by [Emerson Property]."  Nevertheless, during closing argument, TRE seemed to tally five misrepresentations relevant to the First Note.  The Court analyzes each of the alleged misrepresentations separately:

### (1)   Alleged Misrepresentation No. 1 (Ms. Roberts represented in the First Note that she would repay $20,000 but she did not).

TRE failed to prove that Alleged Misrepresentation 1 is actionable by a preponderance of the evidence.  TRE wired $20,000 to Ms. Bordner on May 30, 2019, without any contract, promissory note, or documentation.  A few weeks later, on June 12, 2019, Ms. Roberts received a draft of the First Note.  She executed the First Note later that same day.  The First Note plainly does include Ms. Roberts' promise to pay TRE $20,000.  And, the Court accepts that the First Note has not been paid.  But none of that establishes that the $20,000 debt is nondischargeable under Section 523(a)(2)(A).  There are a myriad of problems with TRE's theory.

TRE's first issue is the timing.  TRE advanced the $20,000 to Ms. Bordner *before* Ms. Roberts executed the First Note.  As set forth in the Court's Findings of Fact, Mr. Chappell admitted that "prior to extending this $20,000 loan" there were no

representations made by Ms. Roberts.  (Trans. 32:24-33:5; *see also* Trans. 32:3-5.)
And Ms. Roberts testified credibly that "[p]rior to the funding of the first loan" she had no
conversations whatsoever with TRE about the First Loan.  (Trans. 215:7-13.)  The Court
has already found that Ms. Roberts made no representations at all, let alone
misrepresentations, to TRE *before* TRE funded the First Loan by sending $20,000 to
Ms. Bordner.  That point is fatal to TRE's claim based on Alleged Misrepresentation No.
1 because the alleged fraud must occur *before* the origination of the debt.  Post-
transaction misrepresentations are irrelevant since the creditor could not have relied on
such misrepresentations when making the loan.  *Ashai*, 211 F. Supp. 3d at 1235-38;
*Osborne*, 520 B.R. at 870; *Hrabik*, 330 B.R. at 772-73; *Donley*, 2014 WL1577236, at *5;
*Parks*, 2007 WL 2033380, at *10-12.

There is another problem as well.  Suppose that the First Note actually had been
executed contemporaneously with the advance of the $20,000 to Ms. Bordner on May
30, 2019.  TRE seems to be suggesting that if a borrower promises to pay a promissory
note and then fails to do so, such circumstances constitute an actionable
misrepresentation.  But that proposition is all wrong.  "In the normal course of events,
the failure to perform a future obligation as promised is a mere breach of contract."
*Wagner v. Wagner (In re Wagner)*, 492 B.R. 43, 51 (Bankr. D. Colo. 2013).  Indeed, "a
promise or declaration, standing alone, is insufficient to support a claim under
§ 523(a)(2)(A), because a promise to perform some act in the future, without more,
does not constitute a representation for purposes of § 523(a)(2)(A)."  *Andresen &
Arronte, PLLC v. Hill (In re Hill)*, 425 B.R. 766, 775 (Bankr. W.D.N.C. 2010).  Even an
intentional breach of contract is not a fraud as contemplated by Section 523(a)(2)(A).
*Id.*  There is an exception.  "[W]hen a promise of future performance is made by one
who has no present intention of performing the promise, it is a misrepresentation that
may be found to be fraudulent."  *Wagner*, 492 B.R. at 51 (citing RESTATEMENT (SECOND)
OF TORTS § 530 (1977) and *In re Kukuk*, 225 B.R. 778, 785-86 (10th Cir. BAP
1998))(emphasis added); *see also Lin v. Pacheco (In re Pacheco)*, 2021 WL 5985178,
at *7 (Bankr. D. Utah. Dec. 16, 2021) ("a debtor's representations of his intentions may
constitute a false representation . . . if when the representation was made, the debtor
had no intention of performing as promised.").

In this case, there is no evidence at all that Ms. Roberts signed the First Note
with the then-present intention that it not be paid.  None.[20]  Indeed, Ms. Bordner initially
started making payments on the First Note.  And, then Artemis Realty made at least
seven payments (probably more) on the First Note.  Without a preponderance of
evidence showing that Ms. Roberts intended all along that the First Note not be paid,
TRE's cause of action fails.  If it were otherwise, virtually every contract between a
debtor and creditor could be characterized as nondischargeable.

There is at least one more gaping hole in TRE's case.  TRE did not *justifiably* rely
on Ms. Roberts' promise to pay contained in the First Note.  Again, based on the timing,

---

[20]      TRE conceded this point in closing argument.  Counsel for TRE stated that Alleged
Misrepresentation No. 1 was false "[b]ecause as evidenced by the fact that she [Ms. Roberts] did not pay
[the First Note] . . . ." and there is "no additional evidence . . . ."  (Trans. 264:3-265:2.)

any sort of reliance on the text of the First Note was impossible because the $20,000 already had been advanced to Ms. Bordner.  But even if there was some sort of reliance by TRE, it most assuredly was not justifiable.  Justifiable reliance requires "the plaintiff must 'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before entering into it."  *Riebesell*, 586 F.3d at 792.  But, TRE did absolutely nothing to examine or investigate.  Although TRE knew Ms. Roberts because it had employed her as a real estate broker for four sales related to the Corona Property, TRE did not ask for or receive a loan application, did not request or obtain any financial information, and did no due diligence before sending the $20,000 to Ms. Bordner.  And, of course, TRE sent the money with no documentation at all in contravention of TRE' own standard policies and procedures.  There was no justifiable reliance.  Thus, TRE failed in its burden to show that Alleged Misrepresentation No. 1 serves as a basis for nondischargeability under Section 523(a)(2)(A).

> ### (2)    Alleged Misrepresentation No. 2 (Ms. Roberts represented in the First Note that she would execute a deed of trust but she did not).

TRE asserts that the $20,000 debt owed by Ms. Roberts to TRE is nondischargeable because Ms. Roberts falsely stated in the First Note that she would pledge the Emerson Property as security.  But the allegation is factually wrong.  The First Note (which was drafted by TRE) says only this:  "This Note is secured by a mortgage deed on the property commonly known as 1453 Race St, Denver CO 80206."  So, the statement was in the present tense.  It does not establish any obligation for future action.  And, the clause referenced the Race Property, not the Emerson Property.  But Ms. Roberts never owned the Race Property.  And, for that matter she never owned the Emerson Property either.  So, she had no way to pledge a property she never owned.  TRE was aware all along that Ms. Roberts could not offer either the Race Property or the Emerson Property as security because she did not own them.  (Trans. 116:6-9.)  So, TRE was not bamboozled by Ms. Roberts.

In any event, TRE's position with respect to Alleged Misrepresentation No. 2 suffers all the same factual and legal infirmities already identified with respect to Alleged Misrepresentation No. 1:  (1) Alleged Misrepresentation No. 2 was made (if at all) *after* TRE already advanced the funds; (2) TRE failed to establish Ms. Roberts' then-present intention of nonperformance; and (3) TRE did not justifiably rely on Alleged Misrepresentation No. 2.  Thus, TRE failed in its burden to prove that Alleged Misrepresentation No. 2 serves as a basis for nondischargeability under Section 523(a)(2)(A).

**(3)    Alleged Misrepresentation No. 5 (Ms. Roberts represented that she would contribute $25,000 to "this project" but she did not).[21]**

Alleged Misrepresentation No. 5 is a new assertion sprung on Ms. Roberts in closing argument at the trial based on Mr. Chappell's uncorroborated testimony. Notably, Mr. Chappell did not testify as to when such statement allegedly was made, how such statement was made (*i.e.,* orally or in writing), or the mechanism for transmission (*i.e.*, in person, by telephone, by Zoom, or by e-mail).  Ms. Roberts testified to the opposite: she never told Mr. Chappell that she and Ms. Bordner "would put in $50,000 dollars of your own money into this project."  (Trans. 200:16-19.)  The Court assesses Ms. Robert's testimony as more credible and accepts it.  So, TRE failed to prove a misstatement by a preponderance of the evidence.

Alleged Misrepresentation No. 5 also suffers the same flaws exposed in Alleged Misrepresentation Nos. 1 and 2.  The Court already has determined that Ms. Roberts made no representations at all to TRE before TRE sent the $20,000 to Ms. Bordner. Even if Alleged Misrepresentation No. 5 was made, it occurred *after* TRE already advanced the funds.  Alleged Misrepresentation No. 5 also appears future-oriented (it was a promise to do something in the future rather than a misrepresentation of then-existing fact).  So, TRE would have been obligated to prove Ms. Robert's intention on May 30, 2019, not to honor Alleged Misrepresentation No. 5.  But TRE introduced no supporting evidence on the issue.  Finally, TRE failed to prove justifiable reliance.  So, TRE missed in its burden to prove that Alleged Misrepresentation No. 5 serves as a basis for nondischargeability under Section 523(a)(2)(A).

**(4)    Alleged Misrepresentation No. 6 (Ms. Roberts represented that she would not take out "additional loans to fund the projects" but she did).**

Alleged Misrepresentation No. 6 is another new one, not tethered to the Complaint.  Mr. Chappell testified that "there were representations made [to Mr. Chappell] [by an unidentified person] that no other loans would be taken on the property."  (Trans. 82:2.)  The testimony was uncorroborated.  Again, Mr. Chappell did not testify when such statement allegedly was made (*i.e.*, before or after the advance of the First Loan).  And, he did not testify how such statement was made (*i.e.,* orally or in writing) or the mechanism for transmission (*i.e.*, in person, by telephone, by Zoom, or by e-mail).  Regardless, Ms. Roberts never took out additional loans on her own behalf. Only Artemis (an entity which did not exist at the time of the First Loan) did.  Also, Ms. Roberts denies the allegation.  Given Mr. Chappell's confusing and contradictory testimony, the Court accepts Ms. Roberts' version.

---

[21]    The Court skips Alleged Misrepresentations Nos. 3 and 4 because they are directed only at the Draft Note, not the First Note.

Alleged Misrepresentation No. 6 also suffers the same flaws exposed in Alleged Misrepresentation Nos. 1, 2, and 5.  The Court already has determined that Ms. Roberts made no representations at all to TRE before TRE sent the $20,000 to Ms. Bordner.  Even if Alleged Misrepresentation No. 6 was made, it occurred *after* TRE already advanced the funds.  Alleged Misrepresentation No. 6 also appears future-oriented (it was a promise to do something in the future rather than a misrepresentation of then-existing fact).  So, TRE would have been obligated to prove Ms. Robert's intention on May 30, 2019, to not honor Alleged Misrepresentation No. 6.  But TRE introduced no supporting evidence on the issue.  Finally, TRE failed to prove justifiable reliance.  So, TRE came nowhere close to meeting its burden to establish that Alleged Misrepresentation No. 6 serves as a basis for nondischargeability under Section 523(a)(2)(A).

> **(5)   Alleged Misrepresentation No. 7 (Ms. Roberts represented that the First Loan and Second Loan proceeds would be used solely "for projects" and not for personal expenses).**

Alleged Misrepresentation No. 7 popped up in closing argument as another effort to attack Ms. Roberts.  The Court already has found that the assertion is factually incorrect.  The Court rejected Mr. Chappell's conflicting testimony and accepted Ms. Robert's testimony instead that no such representation was made.  In fact, there were no representations at all made to TRE by Ms. Roberts before the extension of the First Loan credit.  Furthermore, the Court already has found that Ms. Roberts never used any of the proceeds of the First Loan for personal purposes.  So, Alleged Misrepresentation No. 7 fails on the facts.  But there are other issues.  Alleged Misrepresentation No. 7 also appears directed solely to future conduct (*i.e.,* an alleged promise to do something in the future rather than a misrepresentation of then-existing fact).  So, TRE would have been obligated to prove Ms. Robert's intention on May 30, 2019, not to honor Alleged Misrepresentation No. 7.  But TRE provided no supporting evidence on the issue.  Finally, TRE failed to prove justifiable reliance for reasons already discussed.  TRE did no due diligence at all.  So, TRE shot far wide of the target on Alleged Misrepresentation No. 7, which does not serve as a basis for nondischargeability under Section 523(a)(2)(A).

> **b.   TRE Failed to Establish Nondischargeability of the First Note Debt by Virtue of False Pretenses.**

Although false pretenses were not properly pled as a basis for nondischargeability under Section 523(a)(2)(A) in the Complaint, TRE threw it against the wall in closing argument.  The statutory phrase "false pretenses" is defined as "any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor." *Munoz*, 536 B.R. at 884 n.12; *see also FIA Card Servs., N.A. v. Quinn (In re Quinn)*, 492 B.R. 341, 345 (Bankr. N.D. Ga. 2013) ("False pretenses is defined as '[A]  series of events, activities, or communications which, when

considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor.'").  False pretenses claims require intentional misconduct by the debtor.

In closing argument, TRE relied exclusively on Alleged Misrepresentation Nos. 1-2 and 5-7 to assert the false pretenses theory pertaining to the First Loan debt.  (Trans. 288:9-290:24.)  TRE provided nothing else.  The Court already has determined that Alleged Misrepresentation Nos. 1-2 and 5-7 do not serve as a factual or legal basis for nondischargeability of the debt on the First Loan.  Accordingly, since TRE offered nothing further, the Court determines that TRE has not met its preponderance of the evidence burden to show false pretenses under Section 523(a)(2)(A).

      c.    **TRE Failed to Establish Nondischargeability of the First Note Debt by Virtue of Actual Fraud.**

In closing argument, TRE raised "actual fraud" as another new legal doctrine for nondischargeability of the First Note Debt.  Recently, the United States Supreme Court defined the parameters of the "actual fraud" part of Section 523(a)(2)(A).  In *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356 (2016), the Supreme Court stated:

> "Actual fraud" has two parts: actual and fraud.  The word "actual" has a simple meaning in the context of common-law fraud:  It denotes any fraud that "involv[es] moral turpitude or intentional wrong." . . .  "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or morality." . . . Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Id*. at 360 (citations omitted).  The term "fraud" does not lend to a single and simple definition:

> Although "fraud" connotes deception or trickery generally, the term is difficult to define more precisely.  *See* 1 J. Story, Commentaries on Equity Jurisprudence § 189, p. 221 (6th ed. 1853) (Story) ("Fraud ... being so various in its nature, and so extensive in its application to human concerns, it would be difficult to enumerate all the instances in which Courts of Equity will grant relief under this head"). There is no need to adopt a definition for all times and all circumstances here . . . .

*Id*.

In closing argument, TRE expressly conceded that the only grounds for asserting "actual fraud" were "the use of the funds by Ms. Roberts personally, her depositing those funds from the checking account [of Artemis Realty] into her own personal account."  (Trans. 290:25-291:17.)  TRE also explained why it limited its "actual fraud" argument:  "because I think that, in these circumstances, that [personal use of funds] was the only occasion when Ms. Roberts intentionally deprived or cheated [TRE] of specific property."  (Trans. 291:14-17.)

Taking TRE at its word on this newly articulated idea, TRE has failed to prove "actual fraud."  The reason is simple.  TRE did not introduce any evidence proving that Ms. Roberts used the First Loan proceeds for her own personal purposes.  TRE showed only twelve examples of Artemis Realty withdrawing money from its own bank account to "CASH" between February 2020 and September 1, 2020, plus one instance of an account withdrawal by Artemis Realty.  This evidence shows almost nothing.  It does not establish that any of the funds in the Artemis Realty bank account were funds loaned by TRE.  TRE provided no proof that any of the monies found their way into Ms. Robert's personal bank account or were used personally by Ms. Roberts.  Ms. Roberts testified credibly that all the withdrawn funds were put "in the building [Emerson Property]" to pay contractors and suppliers.  (Trans. 182:10-12.)  The Court has accepted Ms. Robert's uncontroverted testimony and already has determined that Ms. Roberts did not use any proceeds from the First Loan personally.  Accordingly, the entire basis of the "actual fraud" assertion vanishes.

### d.  The First Note Debt Is Dischargeable.

With respect to the First Note, the Court concurs with TRE and has determined that Ms. Roberts is personally obligated on the First Note in the amount of $20,000 plus interest at the annual interest rate of 13% compounded annually (beginning on July 1, 2020, since the "last payment" was in June 2020), plus points and a late penalty as provided in the First Note, all on an unsecured basis.  However, TRE has failed to establish, by a preponderance of evidence, that such debt is nondischargeable under Section 523(a)(2)(A) by virtue of misrepresentations, false pretenses, or actual fraud.  As a consequence, the First Loan debt is fully discharged by the Court's Discharge Order.

## D.  The Second Loan.

### 1.  TRE Failed to Establish Ms. Roberts' Debt for the Second Loan under the Draft Note or Draft Guaranty.

With respect to TRE's nondischargeability claim concerning the Second Loan, the Court's first task is to determine whether Ms. Roberts is indebted to TRE personally under the Draft Note or the Draft Guaranty.  *Thompson*, 555 B.R. at 8 ("the bankruptcy court must determine the validity of the debt under applicable law").  The existence of any debt under the Draft Note and Draft Guaranty is in hot dispute.

Turning to the alleged debt, in the Complaint, TRE argues only that Ms. Roberts is obligated in contract under the Draft Note and Draft Guaranty.[22] TRE acknowledges that neither the Draft Note nor the Draft Guaranty was executed.  However, TRE contends that Ms. Roberts is *personally* liable on the Draft Note and Draft Guaranty as construed together with the Memo.  TRE put it this way:  "Debtor [Ms. Roberts] expressly agreed to the terms and conditions of the $260,000 Note [Draft Note]." (Compl. ¶ 9.)  The Court is not completely clear on TRE's position.  However, it seems that TRE's first theory is that Ms. Roberts is directly liable on the Draft Note as a maker of the Draft Note.  Then, as a fallback second theory, TRE apparently contends that Ms. Roberts also is liable on the Draft Note as a guarantor by virtue of the Draft Guaranty. And, adding further intrigue, TRE also argues that both Artemis Realty and Ms. Bordner also are co-makers obligated on the Draft Note.  (Compl. Ex. 1; asserting that all the defendants (Artemis Realty, Ms. Roberts, and Ms. Bordner) "expressly agreed to the terms and conditions set forth in the $260,000 Note").

### a.    TRE Failed to Establish that Ms. Roberts is Directly Liable on the Draft Note as a Maker.

A promissory note generally constitutes a type of "negotiable instrument" governed by Article 3 of the Colorado[23] Uniform Commercial Code.  COLO. R. STAT. § 4-

---

[22]    In "Plaintiff's Trial Brief" (Docket No. 45), TRE came up with another idea: unjust enrichment. TRE's entire argument was two sentences as follows:

> An unjust enrichment claim does not depend on contract, written or oral, but instead arises from a "contract implied in law."  *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (quoting *DBC Constr. Co. v. Cent. City. Dev. Co.,* 965 P.2d 115, 119 (Colo. 1998).  To recover under an unjust-enrichment theory, a plaintiff must prove three elements: "(1) [T]he defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Id.*

(Docket No. 45 at 2.)  But the phrase "unjust enrichment" was never mentioned at the trial (in closing argument or otherwise).  Accordingly, TRE has waived any assertion of unjust enrichment as a basis for the debt allegedly owed by Ms. Roberts.  *See In re Molycorp., Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1003 n.10 (D. Colo. 2016) (an argument "raised in a perfunctory manner" is deemed waived).  However, any unjust enrichment argument also fails easily on the merits as well because Ms. Roberts did not receive a benefit since the $260,000 was paid by TRE to Artemis Realty, not to Ms. Roberts personally.  And, Ms. Roberts is not "retain[ing] the benefit."  Based on the evidence, Artemis Realty spent the $260,000 on the Emerson Property.  Ms. Roberts has none of such funds and is bankrupt.  So, unjust enrichment just does not fly.  *See Natura Dev. N.V. v. HEH Advisors LLC*, 2020 WL 550661, at *6 (S.D.N.Y. Feb. 4, 2020) ("Plaintiff cites no case where . . . member of an LLC may be personally liable [for unjust enrichment] where the benefit was conferred on the entity and not . . . the member."); *Hughes v. Immediate Response Tech., LLC*, 2015 WL 2157424, at * 11 (E.D. Va. May 6, 2015) (unjust enrichment claim rejected as against individual corporate officer, director, and shareholder because corporation — not individual — received proceeds).

[23]    The Court observes that neither the Draft Note, Draft Guaranty, nor Memo contains a governing choice of law provision.  With respect to transactions generally covered by the Colorado Uniform Commercial Code, in the absence of a contractual choice of law selection, the Colorado Uniform Commercial Code applies if there is an "appropriate relation" to Colorado.  COLO. REV. STAT. § 4-1-301(b). For contracts not covered by the Colorado Uniform Commercial Code, "Colorado has adopted the approach of the Restatement (Second) of Conflicts of Laws in resolving contract choice of law questions."

3-104(e) (defining "note") and 104(a) (defining "negotiable instrument").  The core requirement is an "unconditional promise . . . to pay a fixed amount of money . . . ."  COLO. REV. STAT. § 4-3-104(a).  The "'maker' means a person[24] who signs or is identified in a note as a person undertaking to pay."  COLO. REV. STAT. § 4-3-103(5).  So, a key question with respect to the Draft Note is whether Ms. Roberts is a maker who directly obligated herself personally to pay TRE $260,000.

One of the big difficulties in TRE's case is that the Draft Note is blank:  it has never been signed by anyone.  However, about a month after TRE sent the $260,000 Second Loan proceeds to Artemis Realty, Ms. Roberts signed the Memo.  TRE asks that the Court construe the unsigned Draft Note along with the signed Memo to determine that Ms. Roberts signed individually and so is personally liable for the Second Loan proceeds.  This is a very strange exercise.  Notably, TRE has not provided the Court with citation to any legal authority supporting the use of a subsequent memorandum or letter to transmogrify an unsigned promissory note into an enforceable negotiable instrument.  The Court has located no statute or case law which would support TRE's position.  On that basis alone, the Draft Note almost certainly is not enforceable as a debt against Ms. Roberts personally.

However, in accordance with TRE's unsupported theory, the Court proceeds further.  There is a fundamental legal separation (sometimes referred to as a "corporate veil") between a validly organized business entity (such as a corporation or a limited liability company) and individuals who own or manage such entity (such as officers, directors, shareholders, managers, and/or members).  In Colorado, it is hornbook law that corporate officers and shareholders cannot be held liable for the debts of the corporation based on that status alone.  As the court explained in *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 874-75 (Bankr. D. Colo. 2004):

> As a general rule, a corporate officer or shareholder, by virtue of that status alone is not liable for the acts or debts of the corporation.  *Newport Steel Corp. v. Thompson*, 757 F. Supp. 1152, 1156 (D. Colo.1990) ("A corporation is a separate entity distinct from the individuals comprising it.  Personal liability cannot be imposed on an officer of a corporation merely because that individual is serving in

---

*Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003).  Section 188(2) of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (ALI 1971) advises that in "the absence of an effective choice of law by the parties," factors that should be considered in selecting the applicable law include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of information and place of business of the parties."  The Court determines that Colorado law governs the dispute over the Draft Note, Draft Guaranty, and Memo because: (1) Ms. Roberts and Ms. Bordner reside and work in Colorado; (2) Artemis Realty is a Colorado limited liability company; (3) the business relationship between Ms. Bordner, Ms. Roberts, and TRE was centered in Colorado; and (4) both Ms. Roberts and TRE have repeatedly invoked Colorado law in this Adversary Proceeding.  (Docket Nos. 45, 46 and 54.)

[24]     The term "person" includes an individual, corporation, and limited liability company as well as other types of entities.  COLO. REV. STAT. § 4-1-201(26).

such a capacity.") (citing *U.S. v. Van Diviner*, 822 F.2d 960, 963 (10th Cir.1987)).  That is true even when the officer controls the operations of the corporation or is the sole shareholder of the corporation.

The Colorado Supreme Court similarly held:

> Generally, a duly formed corporation is treated as a separate legal entity, unique from its officers, directors, and shareholders . . . .  This separate status isolates the actions, profits, and debts of the corporation from the individuals who invest in and run the entity .  . . . "Insulation from individual liability is an inherent purpose of incorporation" and personal liability of shareholders is normally limited to their investments in the enterprise . . . . Thus, the corporate veil protects shareholders from individual liability for the actions of the corporation.

*Connolly v. Englewood Post No. 322 Veterans of Foreign Wars of the U.S., Inc. (In re Phillips)*, 139 P.3d 639, 643-44 (Colo. 2006) (internal citations omitted).  Those same principles apply to Colorado limited liability companies like Artemis Realty.  *See* COLO. REV. STAT. § 7-80-705 ("members and managers of limited liability companies are not liable . . . for a debt, obligation, or liability of the limited liability company.").

So, Ms. Roberts is not automatically liable for the debts of Artemis Realty.  In fact, "it is settled beyond peradventure that a person signing a contract only in a corporate capacity, and unambiguously indicating that fact on the face of the contract documents, does not thereby become a party to the agreement."  *McCarthy v. Azure*, 22 F.3d. 351, 356 (1st Cir. 1994).

That has been the rule in Colorado for over a hundred years.  *New England Elec. Co. v. Shook*, 145 P. 1002, 1003 (Colo. App. 1915).  In *Shook*, two individuals who were officers of a corporation signed a promissory note as follows (under the name of a corporation): "R.A. Shook, President" and "H.C. Black, Secretary."  The counterparty tried to collect against them personally.  The Colorado Court of Appeals rejected enforcement of the promissory note against the individual officers because they had listed their corporate titles and held:

> It is a custom of universal practice in the present day for those who sign in the name of a corporation to any business or other document, with the intent to bind the corporation only, to append to the corporate signature their own names, or initials, with their official titles, intending thereby to characterize such signing as an act of the corporation only. Such is the common understanding throughout the business and commercial world, and it would seem reasonable for a

36

> judicial tribunal . . . to recognize such custom and give it full force and effect.

*Id*. at 33-34. *See also MacKay v. Lay,* 470 P.2d 614 (Colo. App. 1970) (affirming denial of personal liability for corporate officer who signed notes as "President" of corporation).

More recently, a specific rule has been adopted by the Colorado legislature (as part of the Colorado Uniform Commercial Code) with respect to negotiable instruments such as promissory notes. COLO. REV. STAT. § 4-3-402(b) states:

> If a representative signs the name of the representative to an instrument and the signature is an authorized signature of the represented person, the following rules apply:
>
> (1) If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument.
>
> (2) . . . if (i) the form of the signature does not show unambiguously that the signature is made in a representative capacity or (ii) the represented person is not identified in the instrument, the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument. With respect to any other person, the representative is liable on the instrument unless the representative proves that the original parties did not intend the representative to be liable on the instrument.

So, the Court must examine the instrument (according to TRE, the Draft Note and the Memo) and assess whether the signature shows that it was unambiguously made on behalf of Artemis Realty (rather than Ms. Roberts individually).

Thus, the Court turns to the text. The first sentence of the Draft Note states:

> FOR VALUE RECEIVED, Karen Bordner and Victoria Roberts, managers of Artemis Realty Investments LLC with offices located at 8300 Fairmont Dr., LL102, Denver, CO promises to pay to the order of [TRE] the principal sum of . . . $260,000 [plus points and interest] . . . .

This is the heart of the Draft Note. A few observations are in order. The Draft Note uses the phrase "promises to pay." That language (particularly the form of the verb "promises") is plainly indicative of a single maker. In other words, only a single maker "promises to pay." Two or more makers would instead "promise to pay" (*i.e.*, no

additional "s").  Then looking a little earlier in the text, the Draft Note refers to "Ms. Bordner and Ms. Roberts, but only in their corporate capacity as "managers of Artemis Realty Investments LLC."  Notably, the words of the first sentence of the Draft Note do not refer to Ms. Bordner or Ms. Roberts agreeing to pay "personally" or "individually." Thus, the plain implication is that Artemis Realty is the sole maker of the Draft Note and Ms. Bordner and Ms. Roberts are expected to execute the Draft Note only in their corporate capacities for Artemis Realty, not personally or individually.  That conclusion is bolstered by the single address: "8300 Fairmont Dr., LL102, Denver, CO."  That address is the corporate address of Artemis Realty and is listed in Artemis Realty's Articles of Organization.  Further to that point, in the First Note (which was designed to be a personal obligation of Ms. Roberts, not a corporate obligation), TRE used a different personal address (4655 Burgundy Ln, Boulder, CO).  And, besides, the use of one address suggests one maker, not three makers.  Reading on a bit, the second paragraph of the Draft Note uses the verb "promises" again, which is indicative of a single borrower.  And, then, more confirmation.  In the fifth paragraph of the Draft Note, there is a reference to "the Borrower."  Again, a single borrower, not three borrowers. That takes us to the signature page of the unsigned Draft Note.  As drafted by TRE (with no input from Ms. Roberts), the proposed signature page of the Draft Note contains two sets of signature lines: first a pair of signature lines under which Mr. Chappell inserted the names of Ms. Bordner and Ms. Roberts.  Apparently, he did not write in their corporate capacity as managers or members of Artemis Realty.  But the Court easily concludes from the entire text and structure that the first set of signature lines are for Ms. Bordner and Ms. Roberts to sign in their corporate capacities for Artemis Realty.  That conclusion is quite obvious because below those signature lines Mr. Chappell added the Draft Guaranty in which he proposed that Ms. Bordner and Ms. Roberts both sign "PERSONALLY."  The dramatic capital letters are in the Draft Guaranty and underscore that one set of signatures was designed for Artemis Realty as the sole maker and then Ms. Bordner and Ms. Roberts were expected to sign separately in their individual capacities.  To further drive home the point, there would be no sense at all for Ms. Bordner and Ms. Roberts to sign the Draft Note personally and then guarantee the exact same obligation "PERSONALLY."

TRE relies on the Memo to convert the Draft Note into something enforceable. Moving to the text of the Memo, the Memo starts by listing the sender and the recipient in initial headings (like letterhead).  The first block identifies the author/sender as "Artemis Realty Investments, LLC," not Ms. Bordner or Ms. Roberts personally.  Then, the second block identifies TRE as the recipient.

The subsequent two blocks of text (six lines) reference some proposed changes to the Draft Note.  TRE has provided no writing accepting the proposed changes.  And then, perhaps the most important part of the Memo is the closing which bears the handwritten signature of Ms. Roberts next to the following text:

> Best Regards,
> Victoria P. Roberts
> Managing Member

Managing member of what?  Of course, Artemis Realty which was identified as the author/sender in the Memo.  So, the Court easily concludes that the Memo is a writing intended to bind Artemis Realty, not Ms. Roberts and Ms. Bordner personally.  That matches with the Draft Note.

Just as important as what is in the Memo is what is not.  The Memo does not refer to the Draft Guaranty (or any guarantee or guaranty).  It does not purport to be executed "PERSONALLY" or individually.  It does not contain the signature of Ms. Bordner (either as a member of Artemis Realty or personally).  And, the Memo is not doubled-signed by Ms. Roberts in both an individual and corporate capacity.  *Cf. Genesis Cap. Ventures, LLC. V. Restore With Apex, Inc.,* 282 F. Supp. 3d 1225, 1231 (D. Colo. 2017) ("Mr. Driver signed the contract twice . . . which may indicate he was signing both as a representative of Apex and in his own personal capacity.")

Another point bears mention.  TRE argues that Ms. Roberts' signature on the Memo was in her personal capacity (notwithstanding that she listed her corporate title) so that she is the maker of the Draft Note.  If that were true, that must mean that Artemis Realty is not a maker on the Draft Note and therefore is not liable because Ms. Roberts did not sign the Memo in her corporate capacity.  *See id.* at 1231 (discussing the importance of double signatures if there is an intention to create both corporate and individual liability).  *See also* 31 FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 1119 (Thompson Reuters Supp. 2023) ("Where individual responsibility of the officer is required, the nearly universal practice is that the officer sign twice, one as an officer, and again as an individual.").  That position is preposterous.  After all, TRE sent the $260,000 Second Loan proceeds to Artemis Realty — not Ms. Roberts.  And, TRE sued Artemis Realty on the Draft Note in the State Court Case.

Ms. Roberts argues that she did not agree in either the Draft Note (which she never signed) or the Memo (which she did sign) to be personally responsible for the $260,000 Second Loan.  She contends that "the parties' intent was for Artemis [Realty] to be the maker on the [Draft Note], not Ms. Roberts individually."  (Docket No. 54 at 4.) And, the point was made repeatedly in closing argument.

The Court concurs.  Ms. Roberts' argument aligns exactly with the text of the Draft Note and the Memo (as explained above).  Together, the language of the Draft Note and the Memo (including the signature block) compels the conclusion that Artemis Realty was the only intended maker of the Draft Note: not Ms. Roberts individually. Since "the form of the signature shows unambiguously that the signature [was] made on behalf of the represented person [Artemis Realty] who [was] identified in the instrument, the representative [Ms. Roberts] is not liable on the instrument."  COLO. REV. STAT. § 4-3-402(b).  *See also Genesis Capital*, 282 F. Supp. 3d at 1331 (personal liability plausibly alleged because "his signature does not include his title"); *Rink-A-Dinks v. TNT Motorcycles, Inc.*, 655 P.2d 431, 432 (Colo. App. 1982) (where president and secretary of company signed contract in their corporate capacities but also "INDIVIDUALLY," they were personally liable; *J.F. Kroh v. Pronto Petroleum Co.*, 536

P.2d 860 (Colo. App. 1975) (affirming dismissal of complaint against corporate officer who signed promissory note in representative capacity noting his title as "Secretary" of company; but affirming personal liability of other corporate officers who signed promissory note but did not list their corporate titles).

As a final level of analysis, even if the Court construed Ms. Roberts' signature on the Memo as somehow "ambiguous," TRE's assertion of personal liability still would fail under COLO. REV. STAT. § 4-3-402(b)(2) because TRE is the original counterparty and the extrinsic evidence proves that neither Ms. Roberts nor TRE intended that Ms. Roberts would be personally liable as a maker on the Draft Note and Memo. Ms. Roberts testified that she did not intend that the Memo act as some sort of personal guaranty of the Second Loan to Artemis Realty and only sent it in her capacity as the Manager of Artemis Realty. (Trans. 200:1-14.) Even Mr. Chappell had the same understanding. Notably, Mr. Chappell testified as follows:

> Q. Now, I want to turn to the letter that's been admitted as Exhibit 21 [the Memo] . . . . Now with respect to this letter, at the bottom it states . . . 'Victoria P. Roberts, Managing Member', correct?
>
> A. Yes.
>
> Q. And you, yourself are a managing member of a company, right?
>
> A. Yes.
>
> Q. So you are aware that is a different capacity than somebody acting individually, right?
>
> A. Yes.

(Trans. 120:24-121:10.) In addition to that testimony, the Court observes that Artemis Realty made all the payments on the Second Loan. And, it is implausible that Ms. Roberts and TRE intended for Ms. Roberts to be bound personally on the Draft Note while Artemis Realty was not.

Thus, the Court concludes that TRE failed in its burden to prove that Ms. Roberts is personally liable to TRE as a maker on the Draft Note as transmogrified by the Memo.

### b.    TRE Failed to Establish that Ms. Roberts is Secondarily Liable on the Draft Note as a Guarantor.

Although the Court has already dispatched TRE's main argument for personal liability against Ms. Roberts, TRE also sometimes has suggested that Ms. Roberts is personally liable for the Second Loan as a guarantor of the Draft Note by virtue of the

40

Draft Guaranty. There is a rather obvious answer to TRE's claim: Ms. Roberts never signed the proposed Draft Guaranty. In fact, she refused to do so because she did not want to guaranty the repayment of the Draft Note personally.

Faced with that seemingly insurmountable hurdle, TRE appears to retreat again to the Memo as somehow operating as a personal guaranty. Although guaranties may not be "negotiable instruments" under the Colorado Uniform Commercial Code, the same basic legal principles discussed above are applicable. Furthermore, "guaranty agreements, as distinguished from ordinary contracts are to be strictly construed and are not to be extended by implication beyond the express terms of the instrument or the plain intent of the parties." *A.R.A. Manufacturing Co. v. Cohen*, 654 P.2d 857, 859 (Colo. App. 1982).

The Court focuses on the text and the intent of the parties. Turning to the body of the Draft Guaranty, the Draft Guaranty is denominated separately from the Draft Note with the heading: "PERSONAL GUARANTEES." So, it is something different that the Draft Note itself. In any event, the body of the Draft Guaranty consists of a single sentence: "The undersigned agree to personally assume joint and several liability for this debt [referring to the Draft Note]." Then, there are blanks for Ms. Bordner and Ms. Roberts to sign "PERSONALLY." But they refused to execute the Draft Guaranty. Ordinarily, that would be the simple end of the matter.

However, TRE apparently asks the Court to apply the Memo as transforming the unsigned Draft Guaranty into a real guaranty. Why and how? The Court does not know. TRE has provided the Court with no legal authority of any kind suggesting that the Memo operates to create a guaranty. And, the Court has been unable to locate any support for TRE's position. Part of the problem is that the Memo says absolutely nothing about the Draft Guaranty. The words "guaranty," "guarantees," "guaranteed" and the like are nowhere mentioned in the Memo. So, the Court finds on a textual basis that the Memo does not convert the unsigned Draft Guaranty into a personal liability of Ms. Roberts.

TRE has another problem. Even if the Memo purported to be some sort of guaranty, Ms. Roberts did not sign the Memo in per personal capacity and thereby create individual liability. Instead, as explained in detail above, the signature of Ms. Roberts on the Memo was solely in her corporate capacity as the Manager of Artemis Realty. The Court simply reiterates its prior legal analysis. Since Ms. Roberts did not sign the Memo in her personal capacity, it follows that she cannot be personally liable as a guarantor.

If the Court turns to extrinsic evidence of intent, the result is the same. As noted previously, on July 3, 2019, Ms. Roberts told Mr. Chappell that she would not sign a personal guarantee. (Trans. 216:24-217:24.) The Court already has accepted Ms. Roberts' testimony on the point over Mr. Chappell's version. And, besides, Mr. Chappell has acknowledged that the "Managing Member" notation on the Memo is a different capacity than somebody acting individually. (Trans. 120:24-121:10.) So, while

41

Mr. Chappell obviously wanted Ms. Roberts to provide a guaranty of the Second Loan, there was never a meeting of the minds that she would do so.

Thus, the Court concludes that TRE failed in its burden to prove that Ms. Roberts is personally liable to TRE pursuant to the unsigned Draft Guaranty as supplemented by the Memo.

2. **Since TRE Did Not Establish that Ms. Roberts Is Personally Indebted to TRE under the Draft Note or Draft Guaranty, TRE's Claim on the Second Loan Fails and Any Alleged Debt on the Second Loan is Discharged.**

As explained previously, Section 523(a) nondischargeability claims all require a two-part analysis: the "claim on the debt" component; and the "dischargeability" component. *Thompson*, 555 B.R. at 8; *Lang*, 293 B.R. at 513. TRE failed the "claim on the debt component" with respect to the $260,000 Second Loan. Thus, TRE's Section 523(a)(2)(A) claim on the Second Loan is denied and the alleged debt is fully discharged by the Court's Discharge Order.

Having already decided the issue, the Court exercises its judicial discretion to refrain from a further full exposition on TRE's assertions of Alleged Misrepresentation Nos. 1-7, false pretenses, and actual fraud with respect to the alleged debt on the Second Loan. More legal analysis would serve no real purpose at this juncture. And besides, the Findings of Fact and most of the discussion of the Alleged Misrepresentation Nos. 1-7, false pretenses, and actual fraud with respect to the debt on the First Loan apply equally to the alleged debt on the Second Loan. The Court merely references and incorporates such legal analysis with respect to the alleged debt on the Second Loan. Based upon the foregoing, it is beyond peradventure that TRE also would fail to meet prove up the "dischargeability" component of its Section 523(a)(2)(A) claim in relation to the alleged debt on the Second Loan.

## VI. Conclusion and Order

Based on facts as determined by the Court, and for the reasons stated above, the Court:

ORDERS that judgment shall enter in favor of Ms. Roberts and against TRE on TRE's remaining claim under 11 U.S.C. § 523(a)(2)(A). TRE's entire claim is deemed dischargeable in Ms. Roberts' bankruptcy case.

DATED this 17th day of March, 2023.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge